In re U. S. FINANCIAL SECURITIES LITIGATION.

PENN MART REALTY COMPANY, Plaintiff,

v.

UNITED STATES FINANCIAL, INC., et al., Defendants.

Michael FABRIKANT and Milton Binswanger, Plaintiffs,

v.

Robert G. STEWART et al., Defendants (two cases).

Civ. Nos. 74-281-T to 74-283-T. MDL No. 161.

United States District Court, S. D. California.

Sept. 11, 1974.

See also, D.C., 375 F.Supp. 1403, 385 F.Supp. 586.

**446**

Melvyn I. Weiss of Milberg & Weiss, New York City, for plaintiffs Fabrikant and Binswanger.

Irving Morris of Cohen, Morris & Rosenthal, Wilmington, Del., for plaintiff Penn Mart Realty.

Edward W. Keane of Sullivan & Cromwell, New York City, for defendants John L. Weinberg and Goldman, Sachs & Co., and various other underwriters.

J. Asa Rountree of Debevoise, Plimpton, Lyons & Gates, New York City, for defendants Philip Hampton, Philip D. Reed, Edwin Singer, Thomas W. Smith and Walter N. Thayer.

Irwin F. Woodland of Gibson Dunn & Crutcher, Los Angeles, Cal., for defendant Touche, Ross & Co.

James W. Colbert, III, of O'Melveny & Myers, Los Angeles, Cal., for defendant Union Bank.

TURRENTINE, District Judge.

## BACKGROUND

This Order is made in response to requests for class designations in the U.S. Financial Securities Litigation.

U.S. Financial was initially incorporated in 1962 and thereafter engaged directly or through subsidiaries in the business of designing, producing, financing, insuring, and selling residential and commercial land and structures. Its securities were first listed on the New York Stock Exchange in December 1970. In April 1971, U.S.F. made a $35,000,000 public offering of 5½% Convertible Subordinated Debentures due April 1, 1991, underwritten by Goldman, Sachs & Co. Simultaneously certain U.S.F. shareholders made a public offering of 256,171 shares of U.S.F. Common Stock through underwriters represented by Goldman, Sachs & Co.

On October 16, 1972, the N.Y.S.E. halted trading in U.S.F. securities for a two week period after receiving copies of correspondence between U.S.F. and the Securities and Exchange Commission regarding the manner in which certain transactions had been accounted for in U.S.F.'s annual report for 1971. On December 5, 1972, the S.E.C. issued an order suspending trading in U.S.F. securities, and on July 23, 1973, U.S.F. filed a petition for an arrangement under Chapter XI of the Federal Bankruptcy Act in the United States District Court for the Southern District of California. Reorganization proceedings are in progress.

A number of securities fraud actions have been filed. Typically, U.S.F., its officers and directors, Goldman, Sachs & Co. and other underwriters, the accountants Touche, Ross & Co., and Union Bank have been named as defendants. The plaintiffs in these actions allege that U.S.F. engaged in a continuing scheme of creating sham transactions to create sham profits, which were publicly

reported in registration statements, prospectuses, forms filed with the S.E.C., and press releases. The following description of these transactions has been given:

U.S. Financial held many pieces of real estate. Subsidiary firms were either formed by individuals connected with U.S. Financial, or previously existing firms or individuals were brought into the family of firms associating with U.S. Financial. Pieces of real estate were 'sold' to the subsidiary firms and notes were given to U. S. Financial so that U.S. Financial could add an account receivable to its balance sheet. The subsidiaries were actually to only hold the properties until U.S. Financial could sell them. If cash were involved, arrangements were made to supply the 'buyers' with enough cash so they could, in turn, transfer the money back to U.S. Financial. Secret agreements were made with the operators of the subsidiary firms to the effect that they would be reimbursed for any losses they incurred while holding the properties for U.S. Financial. If the subsidiary firm was scheduled to make a payment to U.S. Financial on the note, secret loans would be given to the subsidiary either directly by persons at U.S. Financial or indirectly through another subsidiary firm. These loan proceeds would then be fed back to U. S. Financial which would then book the receipt of the payment. A definite, circular flow of money created the illusion that U.S. Financial was selling large pieces of real estate for enormous profits. This illusion was created to obtain bank loans and to increase the value of the stock of U.S. Financial.[1]

Twelve of the security holder actions have been transferred to the Southern District of California for consolidated pretrial proceedings pursuant to 28 U.S. C. § 1407. Designations as class actions under Rule 23(b)(3) have been requested in two of these actions; Penn Mart Realty v. U.S. Financial, (74–281–T) and Michael Fabrikant and Milton Binswanger v. Robert G. Stewart (74–282–T and 74–283–T).[2] The *Penn Mart* plaintiff proposes to represent a class of common stock purchasers who purchased between January 1, 1970, and December 5, 1972. The *Fabrikant* plaintiffs propose to represent a class consisting of purchsers of the 5½% Convertible Subordinated Debentures between April 1, 1971, and November 27, 1972.[3] The exact number of securities purchasers who fall within the ambit of these classes in unknown. It is alleged that there are "thousands" of debenture purchasers. There are approximately 4,000 holders of the common stock, but the number of persons who purchased common stock during the class period must be appreciably larger. The question of numbers will be clarified shortly because the defendant U.S. F. has consented to the proposed class designations in both actions and has agreed to identify the class members and mail notice, as to the actions against U.S.F. only, on September 20, 1974. No other defendant has consented to the class designations.

The request for a class designation in *Penn Mart*, which involves claims under Section 10(b) of the 1934 Securities Ex-

---

1. Affidavit of Assistant U.S. Attorney David P. Curnow, appended to Amicus Curiae for the United States, submitted with respect to motions involving U.S. Financial Litigation before Judicial Panel on Multi-District Litigation.

2. Fabrikant filed two separate actions based on different sections of the 1933 and 1934 Securities Acts. Binswanger subsequently moved to intervene in the second Fabrikant

action. On August 21, 1974, a consolidated, amended complaint was filed for both cases naming both Fabrikant and Binswanger as plaintiffs. Since these actions are now identical they will be treated as one action for the purposes of this order.

3. November 27, 1972, is the date trading was suspended by the N.Y.S.E. December 5, 1972, is the date trading was suspended by the S.E.C.

change Act and Rule 10b–5, will be considered first. This discussion will apply to the Section 10(b) and Rule 10b–5 claims in *Fabrikant* as well. It will then be necessary to consider the effect on the class designation of the additional claims raised in the *Fabrikant* action, particularly the claims under Section 11 of the 1933 Securities and Exchange Act.

## PENN MART REALTY

■ Initially the Court must decide pursuant to Rule 23(b)(3) whether or not a class action is superior to other available methods for the fair and efficient adjudication of the controversy and, pursuant to Rule 23(a)(1), whether the class is so numerous that joinder of all members is impracticable. Because the number of common stock shareholders in Penn Mart exceeds 4,000, it appears that a class action is not only the most efficient, but also the only practical way in which the Court can assure representation of all possible plaintiffs.[4]

The significant question in *Penn Mart,* therefore, is whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Additionally, it must be determined whether the plaintiff is a proper class representative. Fed.R.Civ.P. 23(a)(3) and (4).

1. *Common Questions of Law or Fact*

The most serious question of commonality of law or fact pertains to reliance,[5] which will be discussed below. But first, it should be noted that a "common core" of facts may be provided by the

"common nucleus of operative facts" which are necessary to prove a 10b–5 violation. Entin v. Barg, 60 F.R.D. 108, 113 (E.D.Pa.1973), and Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968).

■ The language of Rule 10b–5(a) and (c) makes it unlawful "to employ any device, scheme or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Under this language the relevant inquiry is the existence of a broad course of fraudulent conduct. Such a course of conduct has been alleged in this action:

[T]he Insider Defendants, acting alone or in concert with the other defendants, conspired together, acted and aided and abetted each other to artificially inflate the reported earnings and assets of U.S.F. for the purpose of their own personal gain and of misleading the shareholders of U.S.F. and to artificially inflate the market price of the securities of U.S.F. (¶ 28, Amended Complaint).

The complaint alleges that all of the U. S.F. real estate transactions followed a familiar pattern:

In 1970 and 1971, properties owned by U.S.F. or its subsidiaries were sold not in arm's length sales, but rather to nominees selected by defendants R. H. Walter and Halverson. Although the sales were carefully structured to appear as arm's length transactions, in each case no risk passed to the alleged purchaser. The terms of the transaction were determined solely by the Insider Defendants, and the Insider Defendants caused U.S.F. to provide, either directly or indirectly, the

---

4. The defendants assert there may be as many as 65,000 common stock purchasers, and that this number would result in problems of manageability. However, class actions of this size have not been deemed infeasible. Grad v. Memorex, 61 F.R.D. 88 (N.D.Cal.1973).

5. The defendants argue that damages also raise predominately individual questions of fact. This contention has been uniformly rejected in securities fraud cases. Grad v. Memorex, 61 F.R.D. 88 (N.D.Cal.1973); Entin v. Barg, 60 F.R.D. 108 (E.D.Pa. 1973); and Herbst v. Able, 47 F.R.D. 11 (S.D.N.Y.1969).

funds necessary to buy its properties. In connection with each such sale, U. S.F. reported income to the shareholders and to the public at large through U.S.F.'s financial statements, its forms filed with the S.E.C. and in press releases. (¶ 30, Amended Complaint).

The Court concludes that these allegations provide a common issue of fact for all class members. The alleged real estate transactions are separate, but taken together they form one of the elements of a 10(b) and 10b–5 action, a "course of business which operates or would operate as a fraud or deceit on any person." Proof of this element is relevant to the claim of each class member, regardless of whether there are differences in reliance or damages.

## 2. Reliance

The real issue that presents possible individual questions of fact which militate against the formation of a class extending over the proposed thirty-four month period is the question of reliance, the problem of whether "[t]here was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Advisory Committee's Notes, Proposed Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966).

The defendants argue there is no commonality of fact because the misrepresentations in this case are, not similar, but disparate. The complaint is based on an undisclosed number of statements by the defendants "through U.S.F.'s financial statements, its forms filed with the S.E.C. and in press releases." The misrepresentations related to the financing of a large number of different real estate transactions occurring in 1970–1971. A cursory review of the complaint indicates that the alleged transactions fall into at least nine or ten unrelated groups. More are likely to be disclosed as discovery progresses. Problems in

the similarity of misrepresentations and reliance of shareholders thereon arise because it is unclear that misrepresentations made at any given time reached all stockholders, and because stockholders purchasing at different times were subjected to different misrepresentations.

Even prior to the adoption of the 1966 revision of Rule 23, it was unnecessary to show that all investors relied on the same document. Thus, in Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909 (9th Cir. 1964), the Ninth Circuit rejected an argument that various investors stood in different positions with respect to the representations made to them, and held it was sufficient to maintain the class if the complaint alleged "a common course of conduct over the entire period, directed against all investors, generally relied upon, and violating common statutory provisions." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 914 (9th Cir. 1964). Harris is a somewhat unsatisfactory signpost for the instant litigation because, although it clarifies that all investors need not rely on one document, it does not indicate how much variation in misrepresentations and reliance thereon is possible before commonality of fact is destroyed.

Fischer v. Kletz, 41 F.R.D. 377 (S.D. N.Y.1966), picked up the Harris "common course of conduct" theory and stated that there is not a material variation if the financial statements are "interrelated, interdependent, and cumulative." The Court illustrated with an often quoted simile:

> To be sure, we are not dealing here with a single alleged fraudulent misrepresentation or the issuance of a single document containing several alleged misrepresentations. Like standing dominoes, however, one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements. Fischer v.

Kletz, 41 F.R.D. 377, 381 (S.D.N.Y. 1966).

But as in *Harris*, the facts given in *Kletz* do not indicate the amount of variation in misrepresentation and reliance that will be tolerated. A subsequent case, Green v. Wolf Corporation, 406 F. 2d 291 (2d Cir. 1968), indicated that a substantially similar reiteration of the same facts is required. In that case there were three prospectuses issued over a two year period. They differed with respect to various minutia and not all of the allegations of the plaintiff applied to all of the prospectuses. But some representations were the same and were repeated in each prospectus.

This Court perceives that the *Harris* and *Kletz* cases pertain to a situation in which the same or similar misrepresentations are reiterated throughout a series of documents. In such cases there is commonality of reliance because each investor is in essence relying on the same misrepresentation regardless of which document he consults. Such a theory is reasonable, but it is stretched to the breaking point in this case because it appears that there are many different transactions reported in different statements. The plaintiff has not alleged the same or similar misrepresentation was made in each document. However, it is unnecessary to reject a class designation at this time because of the possible inadequacy of this theory on the facts of this case. Two other reliance concepts have emerged which make a class action feasible.

First, some courts have indicated that in fraud cases the investor's reliance is based, not so much on particular misrepresentations, as on an artificially inflated price which may be the result of a series of misrepresentations. This theory has found its most explicit exposition in Grad v. Memorex, 61 F.R.D. 88 (N.D. Cal.1973), in which the class period from August 1970 to April 1971 was punctuated by differing misrepresentations in S.E.C. filings and in news releases.

[W]hile some sort of reliance on the part of the plaintiff still must be proved, it appears that reliance of the actual, subjective, individual nature necessary in the classical fraud case would unnecessarily encumber large 10b–5 actions and thereby thwart the Congressional interest in providing a means by which investors may recover against market manipulators in federal court. Grad v. Memorex, 61 F.R.D. 88 at 99 (N.D.Cal.1973).

. . . .

In recent years a more realistic definition of the reliance requirement has evolved, the use of which permits huge securities cases to proceed under Rule 23(b)(3), yet assures fairness to the defendants. By use of an objective standard of reliance, focusing on a "causal nexus" between the alleged misstatements and an inflated price upon which plaintiffs relied, the court (and jury) is freed from the overwhelming task of examining the subjective intent of each class member in his decision with respect to his stock. Id. at 100.

. . . .

If it is demonstrated that the Memorex documents materially misrepresented the financial status of the corporation and that the market responded thereto in a manner that the stock can be said to have been "inflated," and that it was reasonable for an investor to rely thereon, then a sufficient showing of a causal connection between the misrepresentations and the purchases by class members will have been made. *Id.* at 101.

Similarly, in Siegel v. Realty Equities Corporation of New York, 54 F.R.D. 420 (S.D.N.Y.1972), the class action was permitted to proceed on the theory that the market price of the R.E.C. stock had been artificially inflated. The defendants contended that there was no proof

of reliance because the plaintiff could not ascertain specifically which of the twelve documents in question he relied on. However, the Court accepted the argument that reliance might be based on the artificially inflated market price alone:

It appears to this Court . . . that if plaintiff at trial can sustain the difficult burden of proving defendants issued false statements concerning their financial condition and paid dividends in contravention of their agreements with creditors, and that these activities caused the market price of REC securities to be inflated, a jury might find it reasonably foreseeable that such inflated prices would induce the public to purchase REC stock, and subsequently to suffer damages when the misrepresentations were uncovered. Siegel v. Realty Equities Corporation of New York, 54 F. R.D. 420, 425 (S.D.N.Y.1972).

■ The artificially inflated market price theory makes it unnecessary to prove that each investor relied on the same misrepresentation. It is sufficient to show that there were different misrepresentations which were a part of a common scheme to manipulate the price of the stock. The facts of the instant case fit this theory. It may develop that there is some variance between misrepresentations, but the misrepresentations taken as a whole appear part of an uninterrupted manipulation of the price over the alleged class period.

Second, the plaintiff may be able to proceed in this case on a theory of non-disclosure. Although defendants protest that the gravamen of the plaintiff's claim is one of misrepresentation, the court notes that the complaint has properly pleaded omission as well, and the court cannot determine at this point that it is impossible to proceed on this theory. Under the decisions in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Mills v. Electric Auto-Lite

Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970); Kohn v. American Metal Climax, Inc., 458 F.2d 255 (3d Cir. 1972) and Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), it is arguable that reliance is not an essential element of a claim for damages under Section 10(b) and Rule 10b–5, and only the materiality of the misrepresentation or omission need be proved. Recently a number of courts have indicated that a class designation will not be denied on the question of individual reliance where the cause of action can proceed on non-disclosure. Entin v. Barg, 60 F.R.D. 108, 111–112 (E.D.Pa.1973); In re Caesars Palace Securities Litigation, 360 F.Supp. 366, 399 (W.D.Mo. 1973); In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1344 (E. D.Pa.1972).

The Court concludes that individual questions of reliance do not predominate. The plaintiff may proceed either on a theory of reliance of the class as a whole on an artificially inflated market price, or on a theory of non-disclosure.

3. *The Effect of White v. Abrams*

The plaintiffs also argue that the "flexible duty standard" recently adopted by the Ninth Circuit in White v. Abrams, 495 F.2d 724 (9th Cir. 1974), creates predominating individual issues of fact. The "flexible duty standard" replaces scienter or other state of mind concepts as an element in Section 10(b) actions. The Ninth Circuit provided the following yardstick for determining the extent of the duty owed:

Without limiting the trial court from making additions or adaptations in a particular case, we feel the court should, in instructing on a defendant's duty under Rule 10b–5, require the jury to consider the relationship of the defendant to the plaintiff, the defendant's access to the information as compared to the plaintiff's access, the benefit that the defendant derives

from the relationship, the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions and the defendant's activity in initiating the securities transaction in question. White v. Abrams, 495 F.2d 724, 735 (9th Cir. 1974).

Defendants argue that the "flexible duty standard" renders this class action impracticable because it is necessary to evaluate the duty owed by each of the many defendants to each of the plaintiffs. Literally thousands of determinations of duty would be required.

■ *Abrams* does not destroy the class designation in this case for two reasons. First, the overall impact of *Abrams* is to extend the range of liability in individual Section 10(b) actions. Negligent conduct, which has been rejected by some courts as the basis for a Section 10(b) claim, is now adequate in the Ninth Circuit to establish liability under certain circumstances. It would therefore be incongruous for *Abrams* to restrict the use of class actions, which are the primary vehicle by which the investing public may obtain a recovery for Section 10(b) and Rule 10b–5 violations. Second, it will be unnecessary for the trier of fact in this case to determine the duty of each defendant to each plaintiff. The great majority of plaintiffs are open market purchasers so that their relationship to each of the defendants is identical. The determination of the duty of each defendant to the class as a whole will be no more difficult than establishing the duty of each defendant to an individual plaintiff.

### 4. *Adequate Representation*

■ The defendants argue that Penn Mart Realty is inadequate as a class representative because the plaintiff purchased 100 shares on March 8 and 100 shares on May 16, 1972, near the end of the class period. It is contended that Penn Mart is not typical of the entire class because it could have relied only on those misrepresentations contemporaneous with its purchase. Furthermore, it is asserted that the plaintiff did not rely on any U.S.F. financial reports or prospectuses at all, but relied solely on the market price, Valueline surveys, and the advice of a broker. Defendants contend plaintiff will have no real interest in attempting to prove all misrepresentations in the wide range of the information issued by U.S.F. and reliance thereon. Purportedly a conflict would arise between the plaintiff and earlier purchasers, because plaintiff would have no interest in pursuing earlier claims with equal vigor.

The Court rejects the defendants' contentions in light of the above discussion of reliance. If reliance is placed on the inflated market value of the stock, the situation of the plaintiff is not differentiated from that of other class members. The plaintiff has an interest in proving the entire alleged fraudulent course of conduct which resulted in an inflated price. As a practical matter, the attorney for the plaintiff has a very real interest in demonstrating that the inflated price extended over the entire class period because the success of the class as a whole will largely determine his remuneration. Other cases have held that the class representative may purchase at either the beginning or the end of the class period. In Fischer v. Kletz, *supra,* 41 F.R.D. 377 (S.D.N.Y.1966), the representative purchased in the beginning of the class period and in Green v. Wolf, *supra,* 406 F.2d 291 (2d Cir. 1968) the representative purchased in the latter period of the class period.

### 5. *Class Designation*

*Penn Mart* is designated as a class action on behalf of all purchasers of the common stock of U.S.F. between January 1, 1970 and December 5, 1972, who either 1) were holders of such stock on December 5, 1972, or 2) sold such stock and were damaged by the wrongs alleged in the complaint. This initial designa-

tion is subject to change by the Court under the provisions of Rule 23(c)(4). For instance, as the litigation develops it may be appropriate to form subclasses. The registration statement and prospectus in April 1971, and an annual report in April 1972, may provide logical points of division. Also, any purchases of blocks of stock as the result of direct negotiations with the defendants may present predominating individual questions of fact which are inappropriate to this class action.

The plaintiffs have asked the Court to explicitly exclude Section 11 and other claims from the *Penn Mart* class action. It is unnecessary to consider this question at this time because the *Penn Mart* complaint rests on Section 10(b) and Rule 10b–5 only. The Court will examine the matter at a later date should the plaintiff move to amend the complaint or bring in an intervenor to establish a claim under Section 11 or other Sections.

### FABRIKANT

In addition to the Section 10(b) and Rule 10b–5 fraud claims, the *Fabrikant* action seeks to enforce liabilities arising under pendent common law claims, under Section 323 of the Trust Indenture Act of 1939 (15 U.S.C. § 77www), and under other Sections of the 1933 and 1934 Securities Acts, namely Sections 13(a), 18(a) and 20 of the 1934 Act (15 U.S.C. §§ 78m(a), 78r(a), and 78t) and Sections 11, 12 and 17 of the 1933 Act (15 U.S.C. §§ 77k, 77l and 77q.).

### 1. *Superiority of Class Action*

█ This action is not as obviously well adapted to class treatment as the *Penn Mart* action because it may involve fewer security holders and because several large debenture holders have filed separate actions (Nos. 74–384, 74–285 and 74–286). Defendants offer statistics to show that, as of April 1, 1973, 93% of the debentures were held in blocks of $20,000 or more, and 83% were held in blocks of $100,000 or more

by corporations, institutional investors, or brokers in their own or nominees' names. Purchasers of 29% of the debentures are already before the Court. Therefore the defendant argues that joinder is the superior method of proceeding because the debenture holders are sophisticated, institutional investors who have the monetary incentive and means to look after their own interests. Dolgow v. Anderson, 43 F.R.D. 472, 492 (E.D.N.Y.1968). Denial of a class designation will not sound the "death knell" of the litigation.

A similar argument was made and rejected in Dorfman v. First Boston Corp., 62 F.R.D. 466 (E.D.Pa.1973):

> Defendants make much of the fact that as of June 1, 1970, the date of the first interest payment, approximately 85% of the debentures were held in blocs of $25,000 or more, with 61% being held in blocs of $200,000 or more, and that the holdings of ten institutional investors accounted for 40% of all debentures outstanding at that time. (Affidavit of Carole E. Broderick, Esq.) Even assuming, which we do not, that a class action is appropriate *only* if the class is made up of small claimants, we are unable to draw any relevant conclusions from the figures before us. We cannot divine, for example, what portions of the institutional holding were only as of record for individuals and therefore cannot determine the size of the holdings of the beneficial owners of the Pennco debentures. It would be inappropriate to take the drastic step of denying class status on the basis of defendants' figures.

As the plaintiff in this action points out, if the average block were as large as $20,000, there would be over 1,650 purchasers, and one would conclude that there are a large number of individual purchasers, composing a class so numerous that joinder of all the members is impracticable, regardless of the size of the individual claims.

## 2. *Common Issues of Law and Fact*

Our finding of commonality of questions of fact in the Section 10(b) and Rule 10b–5 action in *Penn Mart* applies with equal force to *Fabrikant*. However, in *Fabrikant* the defendants raise an additional argument that the Section 11 claims present a basically different legal claim involving different factual proof from the Section 10(b) and Rule 10b–5 claims.[6] Section 11 of the 1933 Act relates to misrepresentations and omissions in the registration statement, whereas Section 10(b) of the 1934 act is broader and relates to all omissions and misrepresentations.

The main distinctions between the two sections have been set out in Unicorn Field, Inc. v. The Cannon Group, Inc., 60 F.R.D. 217 (S.D.N.Y.1973):

> First, in a § 11 action, . . . recovery is limited to purchasers of shares covered by the defective registration statement. There is no such limitation in a § 10(b) action; any open market purchaser would have standing to sue. Secondly, recovery under § 11 is limited to the difference between the actual purchase price of the shares (not exceeding the initial offering price) and the value of the shares at the time suit is brought or the proceeds received upon sale before or after commencement of suit. § 11(e). Third, the burden of proof in a § 11 action is far less onerous. With certain exceptions [the "due diligence" defenses] plaintiff need only demonstrate that the registration statement and prospectus were materially false and misleading and need not prove fraudulent intent on the part of the issuer. And, . . . reliance on the part of the purchaser is conclusively presumed. Although it is no longer necessary to prove reliance in a § 10(b) action where the gravamen is

nondisclosure, . . . a showing of some causal nexus between the deception and the injury is still required.

The defendants have cited several cases for the proposition that Section 11 and Section 10(b) claims cannot be included in the same class action: Herbst v. Able, [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,922 (S.D.N.Y.1973); Unicorn Field, Inc. v. The Cannon Group, *supra*, 60 F.R.D. 217 (S.D.N.Y.1973); Pearlman v. Gennaro, [1973 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 94,006 (S.D.N.Y.1973); and Wolfson v. Solomon, 54 F.R.D. 584 (S.D.N.Y. 1972). However, a reading of these cases indicates that, although the claims were not included in one class, in every case they were handled as classes or subclasses which were to be included in the same trial. It is possible for the classes or subclasses to be composed of the same plaintiffs and counsel. The Court perceives there is no reason why these claims should not remain part of the same action. Their co-existence would not unduly complicate a trial because the broader Section 10(b) action encompasses the misrepresentations and omissions in the registration statement, which form the basis of the Section 11 action. As stated in Wolfson v. Solomon, *supra*, 54 F.R.D. 584 at (S.D.N.Y.1972). "The Section 11 violation, if it exists, will be proved in the course of proving the Section 10(b) violation, if it exists." To avoid confusing the jury, the Section 11 claim including the "due diligence" defenses can be tried first; then the same jury may proceed with any additional facts, including reliance, which are relevant to the Section 10(b) claim. Herbst v. Able, *supra* [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93,922 (S.D.N.Y. 1973).

The defendants also argue that the claim under Section 12 of the 1933

---

**6.** Defendants also object to the presence of claims under Section 17 of the 1933 Securities and Exchange Act and Section 323 of the Trust Indenture Act of 1939. Since the provisions of Section 17 are similar to Section 10(b) and the provisions of Section 323 are similar to Section 11, the Court discusses only the differences between Sections 10(b) and 11.

Act presents predominating individual questions of law and fact because the "weight of authority has construed the statute to permit suits by a buyer against his immediate seller only." *See,* e. g. DeMarco v. Edens, 390 F.2d 836 (2d Cir. 1968); Unicorn Field, Inc. v. The Cannon Group, *supra,* 60 F.R.D. 217 (S.D.N.Y.1973). Insofar as this interpretation is correct, this section is inappropriate for class treatment. The common law fraud claims brought under pendent jurisdiction are also inappropriate because individual questions of law would predominate if it were necessary to canvass the law of every state in which a purchase of debentures was made.

### 3. *Adequate Representation*

 Defendants argue that Binswanger and Fabrikant purchased at the beginning and end of the proposed class period and therefore are not typical of all class members claiming under Section 10(b) and Rule 10b–5. Binswanger purchased $40,000 worth of the debentures on April 1, 1971, and Fabrikant made purchases of $10,000 on September 29, 1972, and $10,000 on October 11, 1972. The same argument was tendered in the *Penn Mart* case, and it is rejected for the same reasons given in the Court's discussion of *Penn Mart* as a class representative. If it is possible for the representative to purchase at either end of the class period, the plaintiffs' position here is even stronger because the representatives are located at each end of the period.

The defendants also contend that Binswanger and Fabrikant are improper representatives of a class with Section 11 claims, because there is a conflict between their roles as Section 11 and Section 10(b) representatives. The Court in Wolfson v. Solomon has previously analyzed and answered this argument:

> The defendants suggest that, in view of the easier proof required under a Section 11 claim, a common plaintiff who represents both classes would

tend to proffer the easier proof under Section 11 and then rest upon his laurels, oblivious to the fate of the fraud class. I do not believe the argument to be persuasive for two reasons. First, there may be greater recovery under the antifraud sections where Section 11(e) does not apply; and second, it is unrealistic to think that the common lawyer for both classes will forget the fee implications of a greater recovery. While lawyers in these class suits are earning their keep as private Attorneys General, they are not seeking to minimize the recoveries which measure their fees. Wolfson v. Solomon, *supra,* 54 F.R.D. 584 at 589 (S.D.N.Y.1972).

 Binswanger appears to be an adequate Section 11 representative because he purchased at the time of the offering. Fabrikant is less sound as a representative of Section 11 claims because he may have purchased after the issuance of U.S.F. of a "twelve month earning statement." Purchasers prior to such a statement need not prove reliance on the registration statement, but subsequent purchasers must prove reliance, which makes their case substantially more difficult. Section 11(a) [15 U.S.C. § 77k(a)]. Nevertheless, the Court will not reject Fabrikant at this time as a Section 11 representative for two reasons. First, it is argued by the plaintiffs that such a twelve month earning statement was never published, so that Fabrikant need not prove reliance and thus stands in the same position as all Section 11 claimants. Second, even if such a statement exists, Fabrikant still must prove what is essential to the prestatement Section 11 claimants. He merely has the additional burden of proving actual reliance.

### 4. *Class Designation*

The *Fabrikant* actions are designated as a class action on behalf of all persons purchasing U.S. Financial 5½% Convertible Subordinated Debentures between April 1, 1971 and December 5,

1972. Milton Binswanger and Michael Fabrikant are the class representatives. This designation is provisional and the Court will delimit the extent of the class or create subclasses at a later date as necessary. Fed.R.Civ.P. 23(c)(4). For instance, it may appear appropriate to segregate Section 10(b) and Section 11 claims into separate classes, or to separate Section 11 claims into pre- and post-twelve month earning statement subclasses, should the existence of such a statement be proved. Section 12 claims as they may relate to actions by a buyer against his immediate seller, and common law claims, are excluded from the class action.

### NOTICE

The *Penn Mart* and *Fabrikant* plaintiffs shall bear the cost of mailing notice.[7] Counsel for the plaintiffs shall forward drafts of the notices, which shall fulfill the requirements of Fed.R. Civ.P. 23(c)(2), to the Court for approval by September 20, 1974.

---

7. Defendants have objected that Penn Mart Realty has not shown it can pay the cost of notice. The Court notes that counsel has represented that Penn Mart would pay for mailing of notice. The class designation is, of course, conditioned on payment of notice by plaintiffs.