## COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., Plaintiff,

v.

## The COCA–COLA COMPANY, a Delaware corporation, Defendant.

### Civ. A. No. 81–48.

United States District Court, D. Delaware.

Aug. 17, 1982.

Edmund N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., for plaintiff; Emmet J. Bondurant, and H. Lamar Mixson, Trotter, Bondurant, Miller & Hishon, Atlanta, Ga., Roger N. Nanovic, Jim Thorpe, Pa., of counsel.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Griffin B. Bell, Frank C. Jones, and Joseph R. Gladden, Jr., King & Spalding, Atlanta, Ga., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This is an action for declaratory, injunctive, and monetary relief brought by Coca-Cola Bottling Co. of Elizabethtown ("Elizabethtown") against the Coca-Cola Company ("Coca-Cola" or "Company"). Plaintiff seeks to resolve several issues involving the composition and pricing of Bottlers' Coca-Cola Syrup ("Bottlers' Syrup" or "syrup") which it purchases from Coca-Cola. Before the court at the present time are Elizabethtown's motions for class certification under Rule 23 of the Federal Rules of Civil Procedure and for bifurcation of the trial on the declaratory judgment claims from the trial

on the damage claims. The Court will first address the motion for class certification and then the bifurcation motion.

### I. The Motion for Class Certification

 Plaintiff seeks to represent a class of so-called "unamended" bottlers—bottlers who have not amended their contracts with Coca-Cola to permit certain modifications in the composition and pricing of syrup. In a motion for class certification, the plaintiff must make a prima facie showing in its pleading that it satisfies Rule 23. The burden of proving that an action is appropriate for class certification is on the party seeking to represent the class. *See Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974). The class representative need not establish its case on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–2153, 40 L.Ed.2d 732 (1974). Nevertheless, some preliminary inquiry into the merits may be necessary for an intelligent determination of whether to certify the class. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312–13 (4th Cir. 1978).

At issue in this lawsuit are questions arising under consent decrees entered as final judgments of this Court in settlement of *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796 (D.Del.1920), and contracts between bottlers and the Company which incorporate some of the provisions of those judgments. Plaintiff's complaint essentially challenges two practices of the Company—the substitution of high fructose corn sugar (HFCS–55) for granulated sugar in Bottlers' Syrup, and the pricing of the syrup.

Some recital of the facts is necessary to set the controversy in context.[1] An Atlanta pharmacist, Dr. J. S. Pemberton, originally developed the formula for Coca-Cola in 1886. In 1888, Asa G. Chandler, a pharma-

---

1. Plaintiff's brief sets forth over fifty pages of facts. *See* Brief of Coca-Cola Bottling Company of Elizabethtown, Inc. for Class Certification Under Rule 23, Docket No. 60 at 2–55 (hereinafter cited as Plaintiff's Brief). Although in its brief defendant has challenged the statement as argumentative and speculative, it has not al-

leged specific facts in contradiction. *See* Brief in Opposition to Plaintiff's Motion for Class Certification, Docket No. 66, at 6–7 (hereinafter cited as Defendant's Brief). For purposes of these motions the Court will accept the background factual·allegations of plaintiff as true.

cist and owner of a wholesale drug company, acquired an interest in the Coca-Cola trademark and formula. In 1892, he formed The Coca-Cola Company to market Coca-Cola syrup to drugstores as a fountain drink.

The genesis of the Coca-Cola bottling system occurred in 1899. Two Chattanooga lawyers, B. F. Thomas and J. B. Whitehead, obtained the exclusive right to purchase syrup at a fixed price and use Coca-Cola trademarks to sell Coca-Cola in "bottles or other receptacles" throughout the United States.[2] The Coca-Cola Company reserved only the right to manufacture the syrup and to sell the syrup to Thomas and Whitehead and their assignees and to soda fountains.[3] The lawyers established bottling plants in Chattanooga and Atlanta and formed the Coca-Cola Bottling Company as a Tennessee corporation in December, 1899.

In 1900, the Bottling Company divided into two parts, apparently in a business dispute over the nature of the contracts to be granted to the actual bottlers. Whitehead wanted to grant them perpetual contracts, but Thomas sought to grant them only term contracts of two-year duration. Thomas retained ownership of the Coca-Cola Bottling Company, and conveyed to Whitehead and his new business partner, J. T. Lupton, all rights acquired under the 1899 contract except for distribution in fifteen states, the District of Columbia, and small parts of Georgia and Alabama. Whitehead and Lupton ultimately named their company *The* Coca-Cola Bottling Company. For simplicity's sake, the two companies will be identified as the Thomas and Whitehead-Lupton Companies.

These two "parent" bottlers[4] did not bottle or sell Coca-Cola themselves. Rather, from 1900 on, they contracted with so-called "actual" or "first-line" bottlers who built, owned, and operated the plants and bottled, promoted, and sold Coca-Cola in the exclusive territories assigned to them. The parent bottlers assigned to the actual bottlers all rights to purchase Coca-Cola syrup and to bottle and sell Coca-Cola in a given territory.

The first agreement at issue in this lawsuit is a 1907 agreement between the parent bottlers and the Company. In 1907, following passage of the Pure Food and Drug Act of 1906, the Company abandoned its practice of using saccharine in its syrup, and began using a standard granulated sugar.[5] The reformulation of the syrup increased Coca-Cola's costs. After negotiations with the Company, the parent bottlers agreed in 1907 to accept a price increase in the syrup from ninety cents to ninety-two cents per gallon because of the additional expense to the Company in using granulated sugar.[6] Plaintiff alleges that the formula for Coca-Cola syrup—5.32 pounds of sugar per gallon—was part of this unwritten agreement.

The precipitating force behind the litigation which led to the consent judgments at issue here was the effect of World War I on the world economy, particularly the sugar market. Even before the United States entered the war, prices had risen, and during the war rigid price controls were maintained and rationing imposed. In April, 1917, the parent bottlers accepted a temporary price increase of five cents per gallon, bringing the total price per gallon to ninety-seven cents. The ending of the war, the

---

**2.** Eight states were not included in the agreement—the six New England states, Mississippi, and Texas.

**3.** The contract is reproduced in full at 269 Fed. at 800–01.

**4.** The parent companies further subdivided their territories among five companies known as "subparent bottlers." The Whitehead-Lupton Company divided its territory between Western Coca-Cola Bottling Co. and The Coca-Cola Bottling Company; the Thomas Company was divided into Coca-Cola Bottling Works, Coca-Cola Bottling Works 3d, and Pacific Coca-Cola Bottling Co.

**5.** Since 1907, Coca-Cola has manufactured two syrups—a fountain syrup, a heavier, darker syrup for bottling purposes, containing approximately fifteen percent more sugar.

**6.** The agreement was formally incorporated into a contract in 1915.

removal of price controls in September, 1919 and an acute sugar shortage led to a dramatic rise in the price of sugar from nine cents a pound in September 1919 to over twenty-seven cents a pound in June, 1920.

In 1919, the Coca-Cola Company was purchased by a banking syndicate and became a Delaware corporation, assuming the obligations to the parent bottlers. The new corporation entered into an agreement with the principal parent bottlers in December of 1919 to permit the Company to pass on cost increases of sugar in excess of nine cents per pound to the actual bottlers. The Company then sought to enter into new contracts with the parent bottlers which would permit the Company to raise its syrup prices at will. When the parent bottlers strongly rejected this proposal in January 1920, the Coca-Cola Company informed them that their contracts were contracts at will and could be terminated for cause. Efforts to avoid a confrontation proved unsuccessful, and when the parent bottlers threatened to withdraw their consent to temporary price changes unless the Company acknowledged the perpetual nature of their contracts, the Company notified them that their contracts were terminated as of May 1, 1920.

The two principal parent bottlers brought suit in the U. S. District Court for the District of Delaware on June 1, 1920, seeking to enjoin the Company from terminating their contracts. Six first-line bottlers, members of the Coca-Cola Bottlers Association, intervened in support of the parent bottlers.[7] On June 10, 1920, the parties agreed to the entry of a temporary restraining order which permitted the continued operation of the bottling business and fixed the price of syrup to actual bottlers at $1.72 per gallon, based on the Company's representation that its cost was $1.57 per gallon. At that time sugar cost approximately twenty cents per pound.

In the spring of 1920, Coca-Cola's president had entered into what proved to be a disastrous sugar contract with a refiner to purchase sugar at twenty cents per pound. The prices of other soft drinks declined with a decline in the market price of sugar, but Coca-Cola attempted to raise its syrup prices based on estimated increases in cost under provisions for such an increase in the June 10 order. The bottlers instituted a verification of these estimates as permitted under the order. Information emerging from that procedure led to charges that Coca-Cola had fraudulently represented its cost of manufacturing syrup in the June 10 order. Before a special master appointed by the Court could address the issue fully, the parties settled the litigation in July, 1921. The settlement agreements became final judgments of the Court on October 4, 1921.

The bottlers had initially received a favorable determination from the Court on November 8, 1920. In *The Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796 (D.Del.1920), the Court granted the parent bottlers' motion for preliminary injunctions, holding that their contracts with the Company were perpetual and that the parent bottlers had received property rights in the bottling business from the Company. *See* 269 F. at 816. The appeal of this case was pending when the parties executed separate settlement agreements on July 21, 1921. The Court formally incorporated those agreements as final judgments on October 4, 1921.

The judgments established that the contracts between the parent bottlers and the actual bottlers were perpetual. It fixed the price of Coca-Cola syrup to the parent bottlers at $1.17$\frac{1}{25}$ per gallon as a minimum price, and set the ceiling price of sale to the actual bottlers at $1.30 per gallon. The parties further agreed on a formula for pricing syrup in the future which would include all increases in cost to the Company based on the market price of sugar as quoted quarterly by the ten largest refineries in the United States. In addition, the judgment provided that Bottlers' Coca-Cola Syr-

7. The Court permitted the intervention on November 8, 1920. *See* 269 F. at 815.

up would contain no less than 5.32 pounds of sugar per gallon.[8]

The Whitehead-Lupton Company's settlement was conditioned on its actual bottlers' agreements to accept modifications to their contracts so that the contracts, which were already perpetual, would conform to the consent order. It sent out a standard form amendment to its bottlers. The Thomas Company's bottlers had two-year term contracts which for the most part had expired during the course of the litigation. Between August and November of 1921, the Thomas Company entered into new form perpetual contracts with its bottlers which conformed to the consent order.

Between 1923 and 1975, the Company acquired all parent bottlers and assumed their obligations to the first-line bottlers. Beginning in 1979, the Company sought amendments to its contracts with the bottlers to permit a new formula for pricing syrup using a "sugar element," a "base element," and the Consumer Price Index. As of the date of oral argument, approximately 98 bottlers had failed to amend their contracts.[9]

---

8. The relevant portions of the consent judgment are as follows:

3. The said contract as hereby modified shall operate perpetually, but if abnormal or burdensome conditions prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions or occurrence and to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

\* \* \* \* \* \*

5. The parties hereto hereby raise the contract price of Coca-Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17½) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and as provided for by the arbitration clauses herein.

6. In order to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7. It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

\* \* \* \* \* \*

10. The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

\* \* \* \* \* \*

12. Under no conditions shall the arbitration provided for herein reduce the price per gallon to be paid by the party of the first part to the party of the second part for Bottlers' Syrup, below the price hereinbefore specified, of one dollar and seventeen and a half cents ($1.17½) per gallon, including therein five cents (5¢) per gallon for advertising matter.

9. At the time of oral argument, the parties informed the Court that the number of unamended bottlers had declined from 112 at the filing of the lawsuit at 98 in June of 1982. See Transcript of Oral Argument, Docket No. 89, at 21, 42. Since then, the Company has notified

Elizabethtown seeks to assert four claims on behalf of the unamended bottlers. First, it contends that the Company's newly initiated practice of substituting high fructose corn sugar (HFCS–55) for fifty percent of the sugar in the syrup while continuing to charge for the syrup based on the price of granulated sugar violates the 1921 final judgments and the bottlers' contracts. Second, plaintiff alleges this practice violates the 1907 agreement between the parent bottlers and the Company. Third, plaintiff challenges the Company's use of refiners' list prices rather than the competitive prices of sugar to compute syrup prices. Finally, plaintiff seeks a recomputation of the price of syrup based on a $4.3 million settlement that the Coca-Cola Company received in a sugar price-fixing case.

### A. Class Certification

Before the Court may certify an action as a class action, four prerequisites must be met under Rule 23(a). The Rule states in pertinent part:

> (a) Prerequisite to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Court will address each prerequisite in turn.

### 1. Numerosity

Plaintiff seeks to represent a class of up to 96 unamended bottlers in as many as thirty-two states. Defendant contends that the actual class is small and unstable because the number of bottlers has declined since the filing of the lawsuit, and because many unamended bottlers have failed to contribute either a first or a second time to

the legal fund established by Elizabethtown. Defendant further argues that plaintiff has failed to demonstrate that joinder would be impracticable. Plaintiff asserts that the large number of unamended bottlers and their wide geographic dispersion satisfies the numerosity requirement of Rule 23(a).

■ The Court agrees with plaintiff that the class it seeks to represent is sufficiently large to satisfy the numerosity requirement. Although numbers alone are not determinative, numbers over forty, and particularly over one hundred, have been certified as class actions; in general, classes numbering over one hundred are impracticable to join. *See In re Itel Securities Litigation,* 89 F.R.D. 104, 111 (N.D.Cal.1981) (104 underwriters); *Fox v. Prudent Resources Trust,* 69 F.R.D. 74, 78 (E.D.Pa. 1975) (148 limited partners). Each decision, however, "reflects a practical judgment on the particular facts of the case." 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.05[1] (3d ed. 1981).

The mere fact that some unamended bottlers have chosen to amend their contracts with Coca-Cola or that some have not contributed additional money to the legal defense fund does not mean that the class plaintiff seeks to represent is small or unstable. According to figures presented at oral argument, at least fifty-one unamended bottlers have contributed a *third* time to the fund; more importantly, the vast majority of these bottlers have not yet amended their contracts with the Company. The Company has produced no further evidence to show that the class is ill-defined or shrinking significantly. Although the exact number of unamended bottlers is not certain, all members of the class have virtually identical contracts with the Company and are subject to the same general practices of the Company challenged by plaintiff.

Defendant argues that few bottlers would choose to join the lawsuit, because none other than Elizabethtown have expressed any desire to be a named plaintiff.

---

the Court that two additional bottlers have amended their contracts, bringing the number

of amended bottlers to 96. Letter from Frank C. Jones, July 15, 1982.

Defendant therefore reasons that joinder of these few interested bottlers would not be impracticable. *See Aiello v. City of Wilmington*, 426 F.Supp. 1272, 1282–83 (D.Del. 1976) (250 firemen arguably affected by regulations at issue, but few would be interested enough to join in suit to declare invalidity of rules; certification denied); *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43, 48–49 (D.Del.1974) (650 members alleged to be in class, but mere speculation as to how many would actually join, and it would be much fewer than number alleged; certification denied).

■ In this case, however, the Court believes that joinder would be impracticable. The unamended bottlers are scattered throughout the United States, and courts have often held that geographic dispersion renders joinder impracticable. *See Esler v. Northrop Corp.*, 86 F.R.D. 20, 34 (W.D.Mo. 1979) (186 claimants in ten states); *Hi-Co Enterprises, Inc. v. Conagra, Inc.*, 75 F.R.D. 628, 630 (S.D.Ga.1976) (forty-five egg producers in five states). Under the rule it need not be impossible to join all members, but simply impracticable. *See In re Itel Securities Litigation*, 89 F.R.D. 104, 112 (N.D.Cal.1981); *Fox v. Prudent Resources Trust*, 69 F.R.D. 74, 78 (E.D.Pa.1975). The Court is of the opinion that the class satisfies the requirement of numerosity.

### 2. *Commonality*

Defendant's most vigorously asserted argument against certifying this action as a class action is that the requisite "common questions of law or fact" are not present here. In its simplest form, defendant's argument is that this action is no more than a contract action, with federal jurisdiction based on diversity of citizenship, and cannot be treated as a class action because of the different circumstances affecting each individual contract. In addition, defendant contends that certifying this lawsuit as a class action would necessitate determining and applying the laws of up to thirty-two states, rendering the lawsuit chaotic and

unmanageable. Plaintiff contends, on the other hand, that the rights it seeks to enforce flow primarily from the final judgments of 1921, which should be interpreted under Delaware law, and that the contracts themselves may be interpreted in a uniform manner because they are all virtually identical in material terms. These arguments require the Court to determine whether Elizabethtown may litigate questions of law or fact common to the class of unamended bottlers.

First, the Court has serious reservations regarding the standing of Elizabethtown to assert rights under the 1921 judgments. Plaintiff's theory that it may assert rights as a "third-party beneficiary" to the consent judgment because the parties intended the judgments to benefit the actual bottlers must be rejected. It is true that the parties to the judgments sought to fix the legal status of all parties involved in manufacturing Coca-Cola.[10] The Supreme Court has explicitly stated, however:

> [A] well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it.

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975). Plaintiff attempts to avoid this rule by pointing out that parties intended to be benefited by such decrees may intervene in an action to enforce a consent decree as of right. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135–36, 87 S.Ct. 932, 936–937, 17 L.Ed.2d 814 (1967) (intervention by nonparty to protect interests "at the heart" of consent decree); *Missouri-Kansas Pipe Line Co. v. United States*, 312 U.S. 502, 506–08, 61 S.Ct. 666, 667–668, 85 L.Ed. 975 (1941) (intervention of right by parties intended to be benefited by consent decree). Plaintiff seems to assert that the right to intervene in an existing action would somehow confer standing to bring an action in its own right.

---

**10.** The prime example of the fruition of this desire is that subsequent to the settlement of the litigation, all bottlers entered into new or modified contracts with their parent bottlers.

The weakness with Elizabethtown's position is that there is a fundamental difference between having the right to intervene in an ongoing action to protect interests which could be impaired by the resolution of that action, and bringing an action in the first instance to protect one's rights. It may well be that if this were an action instituted by a party to enforce the 1921 judgments, Elizabethtown could meet the requirements of Rule 24(a) of claiming "an interest relating to the property or transaction which is the subject of the action" and being "so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately protected by existing parties." Fed.R.Civ.P. 24(a). Nevertheless, meeting such a requirement would not empower Elizabethtown to enforce the judgment itself, particularly in light of the Supreme Court's express statement in *Blue Ship Stamps, supra*, that nonparties have no such rights.

Plaintiff's alternative theory to enable it to enforce the 1921 judgment is equally flawed. Elizabethtown claims that it is a member or successor member of the 1921 intervening "class" of six actual bottlers. Those six bottlers who intervened in 1921 were Whitehead-Lupton bottlers; Elizabethtown is a Thomas bottler.[11] This distinction is significant because at the time of the litigation, the two groups were not similarly situated with respect to their parent bottlers. Unlike Thomas bottlers, who had only two year contracts with their parents, Whitehead-Lupton bottlers had perpetual contracts with their parent bottlers. The petition for intervention lends support to the contention that the intervenors represented the interests of the Whitehead-Lupton bottlers. That petition stated:

> [The petitioners] bring this petition for the use and benefit of themselves and of various other corporations, firms and individuals throughout the United States operating under contracts similar to those under which the petitioners are operating as hereinafter fully stated and engaged in bottling and selling bottled Coca Cola; said individuals, firms and corporations numbering all together some five hundred separate organizations...

At the time of the lawsuit, there were approximately five hundred Whitehead-Lupton bottlers and over three hundred Thomas bottlers. Based on these facts, the Court does not believe that Elizabethtown may properly be considered a member or successor-member of the "class" represented by the intervenors. If in fact they represented a class, these facts indicate that it was the class of Whitehead-Lupton bottlers.

Plaintiff nevertheless argues that its participation in financing the 1920 intervention should permit it to be treated as if it had been a party to the lawsuit. At the time of the intervention, the Coca-Cola Bottlers Association established a Special Committee which raised money to pay for the intervenors' legal fees. The Special Committee had eleven members, six Whitehead-Lupton bottlers and five Thomas bottlers. Funds for the legal fees were raised by assessing all bottlers a certain amount based on the gallonage of Bottlers' Syrup purchased from Coca-Cola. Plaintiff asserts that because all bottlers were assessed for the litigation they could be considered to have authorized the intervenors to represent them and could be bound by the judgment. *See General Foods Corp. v. Massachusetts Dept. of Public Health*, 648 F.2d 784, 787, 788 (1st Cir. 1981).

It is true that in certain limited circumstances nonparties may be bound by judgments to which they were not parties. As the Third Circuit Court of Appeals has stated: "[R]es judicata is frequently extended to those in 'privity' with the parties to the suit, or to those whose interests were fully

---

11. At the time of the 1920–21 litigation, Elizabethtown was a subbottler of the Louisville Company. The Louisville Company was owned by Fred S. Schmidt, grandfather of Elizabethtown's current president, William Schmidt. It had been a first-line Thomas bottler since 1901. Luke B. Schmidt, Fred Schmidt's son, was a sub-bottler in 1920. It was not until 1936 that the Thomas company issued the first-line contract to Elizabethtown.

and fairly represented by the parties." *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1050 n.4 (3d Cir. 1980) (citations omitted). Some courts have held that in certain cases when an association has litigated an issue, individual members of the association may be precluded from relitigating the issue because their interests were fully and fairly represented in the first suit. This is particularly true when association members have contributed funds to the litigation. *See Ellentuck v. Klein*, 570 F.2d 414, 425–26 (2d Cir. 1978) (individual property owners had been adequately represented by Property Owners Association); *Grossman v. Axelrod*, 466 F.Supp. 770, 775–76 (S.D.N.Y.1979) (individual nursing homeowner had been adequately represented by New York State Health Facilities Association), *aff'd*, 646 F.2d 768 (2d Cir. 1981); *Midway Youth Football Ladies Auxiliary, Inc. v. Strickland*, 449 F.Supp. 418, 422–23 (N.D.Ga.1978) (contribution by nonprofit organization to legal defense fund which litigated prior challenge to statute rendered them in privity).

These cases would be most directly on point had the Coca-Cola Bottlers Association been the intervenor in the lawsuit. An argument could then be made that the individual members could be bound by the Association's participation, if other criteria were met. In the 1920 litigation, however, individual members of the Association intervened, not the Association itself. In order for the Court to hold that Elizabethtown has the right to enforce the 1921 judgments, one would first have to find that the Association controlled the intervention.

 Nonparties who assume control over litigation in which they have a direct financial or property interest may be estopped from litigating issues resolved in the first suit. *See Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Del Mar Avionics v. Quinton Instruments Co.*, 645 F.2d 832, 835 (9th Cir. 1981) (determination of whether nonparty controlled earlier litigation includes such factors as selection and payment of counsel,

payment of litigation expenses, written indemnification agreement, participation in settlement negotiations, and control over decision to appeal); *Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc.*, 484 F.2d 1037, 1039 (3d Cir. 1973) (per curiam). The record here is not clear as to the degree of control exercised by the Association over the course of the intervention; furthermore, there is nothing in the record to indicate that Elizabethtown or its predecessor Louisville ever actually paid money into the fund. Plaintiff asserts the grandfather of Elizabethtown's president was a trustee of the Association and therefore had control over the litigation; that fact alone cannot answer this question. Simply put, before the Court is a company whose parent company was a member of an association which sponsored a committee to fund intervention in a lawsuit by six other members of that association. Even under an expansive reading of *res judicata*, the Court doubts that these facts would entitle a party to the 1921 judgments to enforce them against Elizabethtown. In like vein, the connection to the original litigation is simply too tenuous to permit Elizabethtown to enforce the judgments in direct contravention of the Supreme Court's express statement in *Blue Chip Stamps, supra.*

Having held that this plaintiff may not enforce the 1921 judgments, the Court must next turn to the contract claims. Elizabethtown may bring a suit to interpret its own contract, but it cannot sue on behalf of a class of unamended bottlers whose contracts may well involve the law of thirty-two different states. Courts have often refused to certify class actions when they involve the law of more than one state. The most common example of such cases are securities fraud actions alleging common law fraud. Because each state has its own principles of common law fraud, no uniform law could be applied to the claim. *See, e.g., Elster v. Alexander*, 76 F.R.D. 440, 442 (N.D.Ga.1977) (applying principles of common law fraud of fifty states); *Schmidt v. Interstate Federal Savings & Loan Association*, 74 F.R.D. 423, 428–29 (D.D.C.1977) (applying three states' laws to breach of

contract and unjust enrichment claims would be required if certified); *McMerty v. Burtness*, 72 F.R.D. 450, 454, 456 (D.Minn. 1976) (applying seven states' contract laws and definitions of "securities" would be necessary if certified); *Causey v. Pan American World Airways*, 66 F.R.D. 392, 397 (E.D. Va.1975) (mass accident implicating seven states' choice of law provisions); *In re U. S. Financial Securities Litigation*, 64 F.R.D. 443, 455 (S.D.Cal.1974) (individual questions of law would predominate if court must canvass common law fraud in every state where debenture purchased). As the Fifth Circuit has noted in *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973): "Furthermore, the geographical dispersion of the alleged representations would bring into issue various state common law standards. With no single law governing the entire class, common issues of law cannot be shown to warrant Rule 23 treatment." *Id.* at 883. Plaintiff could cite no case, nor could the Court find one, certifying a class action based on a contract claim brought in diversity which would require the application of the law of more than one state.

■ Balanced against this wealth of authority is the fact that this is unique litigation. The contracts to be construed are identical in their material parts. Furthermore, the contracts are derived from a common source—the 1921 judgment—which may provide a unifying factor not present in the other cases. Nevertheless, at this stage it is more probable than not that individual questions of fact or law will inevitably predominate. A myriad of contract issues lurk in this lawsuit, and the existence of different state rules applying to some bottlers and not others would render adjudication on a class basis virtually impossible. In particular, each unamended bottler's course of dealing with the Company would be relevant to construing the contract language, inasmuch as it could indicate knowledge of or acquiescence in the Company's pricing policies. In addition, the Court would be confronted with the necessity of applying as many as thirty-two different states' rules regarding such contract

questions as parol evidence, third party beneficiaries, waiver and estoppel, imputed knowledge, novation, and so on, to a variety of factual settings occurring over a span of sixty years.

In light of the foregoing, I hold that Elizabethtown has failed to demonstrate that there are common issues of law or fact present in this suit that would make it appropriate for class certification. There are simply too many individual contract questions to be tried. The Court recognizes that there is a certain nucleus of facts surrounding the 1921 litigation which might be common to the class, but believes that these facts would be submerged by the facts surrounding the course of dealing under each individual contract, and the application of different states' laws to each set of facts. I will therefore decline to certify the class.

### 3. Typicality and Adequacy of Representation

■ Although the Court has decided not to certify the class, it will briefly address the remaining elements. Defendant contends that Elizabethtown's claims are not typical of the class. As already noted, Elizabethtown itself cannot sue to enforce the 1921 judgments. This disability would prevent Elizabethtown from asserting a judgment that might have a different legal effect on Whitehead-Lupton bottlers as distinguished from Thomas bottlers. At best, Elizabethtown's claims would be typical of Thomas bottlers. Nevertheless, in light of the fact that the suit would necessarily focus on individual contract interpretation, it is unlikely that any party could be considered to have claims typical of the class. The difference in courses of dealing alone would disable any party from asserting such typicality.

■ Defendant further contends that Elizabethtown would be an inadequate representative because its president, Fred Schmidt, has failed to observe certain corporate requirements in his management of Coca-Cola Bottlers USA (CCBUSA), and

has transformed this organization and its legal defense fund into a vehicle for a personal vendetta against the company. The Court sees no merit in this contention. The failure to observe certain corporate formalities does not in itself render a representative inadequate, particularly because the record now indicates that the technical defects have been rectified. In addition, the record indicates that the unamended bottlers who paid money into CCBUSA's legal fund were notified of the broad purpose of the fund, which was to protect their rights under their contracts. The bottlers who have been deposed thus far have expressed no dissatisfaction with the management of the fund or with Schmidt's representation. Coca-Cola's principal criticism of Elizabethtown appears to be that it is an aggressive and hard-fighting adversary. This fact does not render Elizabethtown inadequate; in fact, it demonstrates that Elizabethtown would zealously represent the interests of the unamended bottlers. The Court believes that Elizabethtown would adequately represent the unamended bottlers.

For the reasons stated, the Court will deny plaintiff's motion for class certification.

II. *Bifurcation of Trial on the Declaratory Judgment Issues for Trial on the Damages Issues*

Plaintiff has also moved for a bifurcation of the trial under Rule 42(b). It is well settled that such a bifurcation is within the trial court's discretion. *Lis v. Robert Packer Hospital*, 579 F.2d 819, 824 (3d Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978). Having denied the motion for class certification, the Court believes that many of the concerns regarding the complexities of proof may be avoided. It is too early in the litigation to determine whether bifurcation of the trial is warranted. The Court will deny the motion at this time without prejudice, so that if at some future time when the parties have conducted sufficient discovery to determine that such an order would be appropriate, the Court may entertain a similar application.

An order will issue in conformance with this Opinion.