[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16430

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00062-CV-3-MCR-EMT

SACRED HEART HEALTH SYSTEMS, INC.,
ST. VINCENTS HEALTH SYSTEM, INC., et al.,

Plaintiffs-Counter
Defendants-Appellees,

versus

HUMANA MILITARY HEALTHCARE SERVICES, INC.,

Defendant-Counter
Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 30, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,[*] Circuit Judges.

_____

[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

MARCUS, Circuit Judge:

Defendant Humana Military Healthcare Services, Inc., a health maintenance organization, appeals the district court's order certifying a class of approximately 260 hospitals in six states, which claim that Humana systematically underpaid them for medical services they rendered to veterans under a federal program, and thereby breached their individual network provider agreements. Humana challenges the district court's determination pursuant to Fed. R. Civ. P. 23(b)(3) that common questions -- in particular the question of whether the federal government forced Humana to pay the hospitals lower rates -- would predominate over individual ones, and that a class action would be a superior method of resolving the instant dispute. After careful review, we agree with Humana that many important uncommon questions raised by this litigation overwhelm the one common issue and render the case unsuitable for class treatment, and that the district court's contrary conclusion was an abuse of discretion. We, therefore, reverse the district court's certification order and remand for further proceedings consistent with this opinion.

## I.

Humana is a managed care organization that contracts with hospitals and other care providers to offer health care services to its members. In 1995, Humana

won a Managed Care Support ("MCS") contract with the federal government pursuant to its CHAMPUS/TRICARE ("TRICARE") program, which offers healthcare services for military retirees and their dependents.[1]  Pursuant to the contract, Humana entered into individual network agreements with numerous healthcare providers located in TRICARE Regions 3 and 4 to provide outpatient non-surgical services to TRICARE beneficiaries.  At the time, Regions 3 and 4 included the states of Alabama, Florida, Georgia, Mississippi, South Carolina, Tennessee, and parts of Louisiana and Arkansas.  Under each network agreement, the hospital would render services to TRICARE beneficiaries and Humana would reimburse the hospital in accordance with the terms of the agreement.  The government would then pay Humana at fixed rates for healthcare costs, subject to periodic redetermination using a risk-sharing formula by which Humana and the government would share increased costs or savings.

The reimbursement dispute at the heart of this case is permeated by two central and related terms, one or both of which appear in many of the payment provisions of the hospitals' network agreements.  The first is the term "CHAMPUS

_____

[1] CHAMPUS, the "Civilian Health and Medical Program for the Uniformed Services," was effectively superseded by TRICARE.  See Defendant's Statement of Facts, Doc. No. 180, ¶ 3; see also Bd. of Trs. of Bay Medical Ctr. v. Humana Military Healthcare Servs., Inc., 447 F.3d 1370, 1372 (Fed. Cir. 2006).  The agreements at issue in this case make varying reference to TRICARE and CHAMPUS, but there is no distinction for purposes of this appeal, and the terms are used here interchangeably.

allowable"; the parties agree that the term refers generally to any allowable maximum payment or payment formula set by TRICARE, and it appears to have meant billed charges or a flat rate prior to 1999. The second term is "CMAC," which is short for "CHAMPUS Maximum Allowable Charges," and which designates a specific schedule of fees patterned after the so-called "resource-based relative value scale" ("RBRVS") used by Medicare and other private payers. See Report of Dr. Zachary Dyckman, at 2.[2] The parties agree that "CMAC" -- or "CMAC rates" -- is one form of a "CHAMPUS allowable."

Prior to October 1, 1999, Humana paid each of the network providers for hospital outpatient radiology and laboratory services either at a percentage of the charges the hospitals billed or at a flat rate. Humana appears to have done so either because that is what the particular network agreement required, or because the network agreement limited payments to the "CHAMPUS allowable," which at the time was understood to mean billed charges or a flat rate. See, e.g., 1 Hr'g Tr. 26. By a written communication dated November 18, 1999, however, Humana informed the network providers that payment for outpatient laboratory and radiology services rendered after October 1, 1999, would be made on the basis of CHAMPUS Maximum Allowable Charges -- i.e., CMAC rates. See, e.g., Letter

---

[2] CMAC is referred to interchangeably here as TMAC, which is short for "TRICARE Maximum Allowable Charges."

4

from Richard J. Mancini, Director, Humana Network Development, to CFO, Baptist Medical Center of Nassau, dated Nov. 18, 1999, Def. Ex. 163.[3] The change in payment policy almost uniformly resulted in lower payments to the providers than under the billed charges/flat fee structure.

Humana justified the change on the ground that the TRICARE Management Activity ("TMA"), a unit of the Defense Department that administers TRICARE for the government, had imposed CMAC as the new "CHAMPUS allowable." Whether or not that was true -- a question that goes solely to the merits of this case -- Humana announced the change in a one-page letter that it claims was sent to all of the hospitals, and which a large majority of the hospitals acknowledge receiving. The letter read in relevant part as follows:

> In accordance with TRICARE/CHAMPUS policy, payment of all outpatient technical and professional laboratory and radiology claims will be made on the basis of CHAMPUS Maximum Allowable Charges (CMAC). Beginning October 1st, 1999, CMAC rates will apply to claims payment for these services performed in the hospital outpatient setting.

See, e.g., Letter from Richard J. Mancini, Director, Humana Network Development, to CFO, Baptist Medical Center of Nassau, dated Nov. 18, 1999, Def. Ex. 163.

---

[3] Humana continued to implement the change to CMAC rates through 2003; it applied CMAC to outpatient therapy on March 1, 2001, to medicine and ambulance services on January 1, 2002, and to other miscellaneous services on April 2, 2003. See 1 Hr'g Tr. 27, June 16, 2008.

5

A small number of hospitals -- approximately nine -- initially objected to the change in payment methodology, but apparently agreed to accept CMAC payments when reminded again of the federal policy-based explanation offered in the November 1999 letter. No hospital appears to have terminated its contract with Humana as a result of the change in payment policy, even though many of the provider agreements contained a termination clause that either party could invoke after a defined notice period. See 2 Hr'g Tr. 238, June 17, 2008.

In August 2002, however, the Baptist Hospital of Florida and the Healthcare Authority of the City of Huntsville, Alabama, sued Humana in the United States District Court for the Northern District of Florida, asserting that the 1999 change in payment methodology constituted a breach of their network agreements. The plaintiffs sought to represent a class of similarly situated hospitals in former Regions 3 and 4. See Baptist Hospital, Inc. v. Humana Military Healthcare Servs., Inc., Case No. 3:02cv317 (N.D. Fla.) (Collier, J.) ("the Baptist Action"). Class counsel in that case, who represent the hospitals in this case as well, voluntarily dismissed the Baptist Action without prejudice in January 2003. See Baptist Action, Docs. 54, 55. In June 2003, the same two plaintiffs, joined this time by the Bay Medical Center of Florida, sued Humana in the same district court, alleging essentially the same claims. Bd. of Trs. of Bay Med. Ctr. v. Humana Military

Healthcare Servs., Inc., Case No. 5:03cv144 (N.D. Fla.) (Rodgers, J.) ("the Bay Medical Action"). That case was dismissed pursuant to settlement prior to a ruling on class certification.

Finally, on February 5, 2007, seven plaintiffs -- Florida providers Sacred Heart Health Systems, St. Vincent's Health System, Southern Baptist Hospital, Baptist Medical Center of the Beaches, Baptist Medical Center of Nassau, together with Our Lady of the Lake Hospital of Louisiana and Phoebe Putney Memorial Hospital of Georgia -- filed the action underlying this appeal, once again in the Northern District of Florida. Seven months later, they moved for class certification in order to answer the question of whether TRICARE had in fact "mandated" Humana's use of CMAC rates.

To help it determine whether certification was appropriate, the district court held a three-day evidentiary hearing at which the parties offered considerable testimony and documentary evidence. This included copies of the more than 300 contracts that fell within the class definition; evidence of TMA policy before and after November 1999, when Humana announced the change in reimbursement methodology; evidence of Humana's and the hospitals' understanding of the term "CHAMPUS allowable" in the contracts where that term appeared; and the parties' understanding of other contractual provisions, including those governing

termination, the timeliness of claims for improper reimbursement, and waiver of defenses to breach.

At the Rule 23 hearing, Humana focused its effort to defeat certification on the terms of the payment clauses themselves, which, although far from the only portions of the contracts relevant to the determination of liability, obviously are central to resolution of the merits of this case. There can be no dispute that those clauses contain a wide variety of language. We discuss that language at length below, but for present purposes, it is enough to observe that some of the contracts contain unqualified reference to billed charges or a flat rate, others limit payment to "any CHAMPUS allowable" and are accompanied by a parenthetical phrase containing one or more such "allowables," still others make partial or exclusive reference to CMAC, and a number of others contain language unique to themselves.

Humana also pointed to a variety of terms other than the payment clauses that might affect whether a breach of the reimbursement provisions is enforceable. These include termination clauses allowing one or both parties to end their contractual relationship after a specified time -- the relevant question being whether a failure to invoke the provision could indicate a forfeiture of the right to object later on -- and waiver clauses specifying whether and when a party's

8

forbearance may be construed as a relinquishment of contractual rights.

Finally, Humana emphasized -- and there is no dispute -- that the laws of each of the six states where the class member hospitals are located would apply to the construction of the network agreements, and to the interpretation of any extrinsic evidence.[4] Humana argued that examination of the varied individual contracts and the extrinsic evidence relevant to the affirmative defenses of ratification and waiver would overwhelm the common question of whether the use of CMAC was mandated by federal policy.

The hospitals responded by introducing testimony of Humana officials indicating, essentially, that the terms of the individual agreements had played no role in Humana's decision to use CMAC rates (and therefore should play no role in determining whether the use of CMAC was legal under the agreements). In this vein, Humana's Medical Director, Dr. John Crum, testified that although he "fe[lt] it[] [was] very important to comply with the terms of the contracts, . . . [he] really had nothing to do with that," 1 Hr'g Tr. 29, and "did not give consideration to the language in th[e] contract[s]" before suggesting the policy change, id. at 30.[5]

---

[4] None of the hospitals identified as falling within the certified class are located in South Carolina or Arkansas, both of which fell at least partly within former TRICARE Regions 3 and 4.

[5] Dr. Crum in fact stated that, had he known Humana was required to pay the negotiated rates set forth in the hospital contracts, he still would have recommended the application of CMAC rates, but before doing so he would have had someone check the terms of each hospital's contract to "see

Crum said he relied for this on Humana's Director of Network Development, Richard J. Mancini. Id. Mancini, however, also disclaimed consideration of the contracts, stating that his role was merely "to send the letters of notice to providers and do what I needed to do with our folks in the field so they could understand th[e change] . . . [in the event] somebody came back and wanted to renegotiate." Id. at 31.

Finally, Mr. Robert Shields, who was the CEO of Humana Military at the time of the reimbursement change, stated that he had not "review[ed] [any] network[] provider contracts" to see if they "would have ostensibly required the network providers to accept the CMAC fee schedule." Id. Nor did he recall any discussion of the contracts "taking place in the decision to apply CMAC fee schedules to hospital radiology and laboratory services." Id.

Separately, the hospitals urged that even if the varying contractual terms were relevant, they still could be grouped into six categories that might be useful in creating subclasses. One category, for example, contained only contracts with unqualified reference to billed charges or flat rates, while others included contracts that limited payment to some form of the "CHAMPUS allowable," or that referred expressly to CMAC rates. Notably, however, one of the six categories was a

_____

if there was a problem with it." Crum Dep. 60:7-9, Dec. 20, 2007.

10

"miscellaneous" one containing over twenty contracts.

To all of this, Humana responded that its reasons for making the payment change did not conclusively, or even marginally, answer the question of whether some or all of the varied network agreements nonetheless authorized payment at CMAC rates. Further, Humana drew attention to individualized liability issues flowing from the parties' course of dealings. Thus, for example, it presented evidence that approximately thirty hospitals, all claiming that their 1999 contracts did not authorize payment of CMAC absent a federal directive, subsequently entered into new contracts with Humana containing the same payment language, notwithstanding their awareness that Humana had implemented its CMAC payment policy. Humana argued that this acceptance of the new status quo was an affirmative ratification of its policy -- and, notably, would require examination of individualized extrinsic evidence. Similarly, Humana highlighted the aforementioned evidence that, among all the hospitals in the certified class, only about nine of them objected to the use of CMAC, suggesting that the rest of the hospitals waived their rights to challenge the CMAC payments.

Humana ultimately made the following broad claims in the district court, all of which it renews on appeal: first, that the significant variation in the material terms of the network agreements -- which appear to support Humana's contractual

11

defenses to varying degrees and in different ways -- alone defeated predominance and superiority; second, that certain of the contracts contained ambiguities, which, under the laws of each of the six relevant states, would require recourse to extrinsic evidence of the parties' pre- and post-contract negotiations and dealings; third, that even as to contracts whose material terms were unambiguous, the evidence would show that many of the hospitals either ratified the change to reimbursement at CMAC rates, or waived any claim of breach by knowingly accepting CMAC payments for over ten years (both defenses raising a host of issues requiring examination of individualized extrinsic evidence); and, finally, that the laws of the six relevant states differed materially in their treatment of the extrinsic evidence.

The district court rejected each of these claims and certified a single class comprised of:

> All institutional healthcare service providers in TRICARE former Regions 3 and 4 which had contracts with Humana to provide outpatient non-surgical services to CHAMPUS/TRICARE beneficiaries as of November 18, 1999, excluding those network providers who contractually agreed with Humana to submit any such disputes with Humana to arbitration.

Order Granting Motion for Class Certification ("Certification Order") at 20, Sacred Heart Health Sys. v. Humana Military Healthcare Servs., Inc., Case No. 3:07cv62 MCR (N.D. Fla. Sept. 25, 2008) (Rogers, J.). The district court declined to create subclasses based on either the variations in contract language or differences in

applicable state law, although it noted that if division proved necessary, the use of either or both sets of subclasses -- six subclasses in each category -- likely would suffice. See id. at 18 & n.22. Humana timely petitioned for interlocutory review pursuant to Rule 23(f), and we granted the petition. See Fed. R. Civ. P. 23(f).

## II.

"The decision to certify is within the broad discretion of the district court," and we review for an abuse of that discretion. Klay v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004) (citation omitted).

> A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner. Finally, an abuse of discretion occurs if the district court imposes some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to anyone else or society at large. In making these assessments, we review the district court's factual determinations for clear error, and its purely legal determinations de novo.

Id. (citation omitted). Recognizing the "awesome power of a district court" in controlling the availability of the class action mechanism, id., we require that decisions to certify a class rest on a "rigorous analysis" of the requirements of Rule 23, Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1266 (11th Cir. 2009) ("A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." (citation omitted)).

13

Humana does not dispute that the requirements of Rule 23(a), which apply to all class actions, have been satisfied in this case.[6]  Rather, the sole issue in this appeal is whether the district court abused its discretion in determining that the prerequisites of Rule 23(b)(3) had been met.  A class may be maintained pursuant to Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In this appeal, the parties raise the same arguments concerning predominance and superiority as they did in the district court.  We address them in turn.

A.

"Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000).  Common issues of fact and law predominate if they "'ha[ve] a direct impact on every class member's effort to establish liability' that is

---

[6] Pursuant to Rule 23(a), every class action must have the following four characteristics: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

14

more substantial than the impact of individualized issues in resolving the claim or claims of each class member." Vega, 564 F.3d at 1270 (emphasis added) (quoting Klay, 382 F.3d at 1255). If "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)." Klay, 382 F.3d at 1255. In practical terms, while "[i]t is not necessary that all questions of fact or law be common," id. at 1254 (citation omitted), "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered." Id. at 1255 (quoting Alabama v. Blue Bird Body Co., 573 F.2d 309, 322 (5th Cir. 1978)).

To assess the impact of a common question on the class members' claims, a district court obviously must examine not only the defendant's course of conduct towards the class members, but also the class members' legal rights and duties. A plaintiff may claim that every putative class member was harmed by the defendant's conduct, but if fewer than all of the class members enjoyed the legal right that the defendant allegedly infringed, or if the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones. This principle emerges

15

clearly from our case law and that of other circuits.  See, e.g., Vega, 564 F.3d at 1272 ("Without the existence of a common contract, of course, there can also be no commonality with respect to whether T-Mobile's conduct . . . , even if undertaken pursuant to a uniform policy, constituted a breach of every class member's particular employment contract."); Gene & Gene LLC v. Biopay LLC, 541 F.3d 318, 326-29 (5th Cir. 2008) (reversing class certification predicated on defendant's "common course of conduct, fax blasting," where the district court "did not explain how th[is] common course of conduct . . . would affect a trial on the merits," and where a trial in fact would require individualized proof as to whether each class member had consented to receipt of faxes); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998) (reversing certification based on defendant's alleged breach of franchising agreements, where the agreements variously supported or undermined the plaintiffs' theory of liability); Sprague v. Gen. Motors Corp., 133 F.3d 388, 398 (6th Cir. 1998) (en banc) (reversing certification of claim by General Motors retirees that company breached their contracts by reducing their benefits at the same time and in the same manner, where each "contract" arose from an individual "side deal" with the company).

While acknowledging that it provided every hospital with the same justification for changing its payment formula -- namely, a new mandate from the

16

federal TRICARE authority -- Humana argues that any questions arising from this common course will be overwhelmed by individualized issues flowing from variations in the contractual terms and the parties' course of dealings. For a number of reasons that we discuss in turn, we agree.

1.

In the first place, claims for breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contracts. It is the form contract, executed under like conditions by all class members, that best facilitates class treatment. See, e.g., Klay, 382 F.3d at 1263 (reversing certification of breach of contract action involving numerous different contracts, and observing that "this is not a situation in which all plaintiffs signed the same form contract"); Kleiner v. First Nat'l Bank of Atlanta, 97 F.R.D. 683, 692 (N.D. Ga. 1983) (noting that "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action," and collecting numerous cases in which such claims were certified). Absent such ideal conditions, and particularly in cases involving numerous or different contracts, we have "hesita[ted] to conclude that common issues of fact predominate," Klay, 382 F.3d at 1263, and we have required at the threshold that all of the subject contracts be "materially similar."

17

See Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003). See also Sharkus v. Blue Cross of Greater Phila., 431 A.2d 883, 886-87 (Pa. 1981) ("[A] class action may be maintained even when the claims of members of the class are based on different contracts where the relevant contractual provisions raise common questions of law and fact and do not differ materially.").

We discerned such material similarity in Allapattah Services v. Exxon Corp., where we upheld the certification of a class of 10,000 Exxon gas station owners who claimed that Exxon had breached their individual sales agreements. Specifically, the owners claimed that Exxon had secretly begun overcharging them by failing to implement the terms of its "Discount for Cash" program, which required that the company offset a surcharge on credit card gasoline sales with a corresponding reduction in the wholesale price of gasoline. 333 F.3d at 1252. While each dealer had a different contract, each contract "included express language to the effect that any breach of a provision by either party of a failure to carry out the contract provisions 'in good faith' was conclusively deemed to be substantial." Allapattah Servs., Inc. v. Exxon Corp., 61 F. Supp. 2d 1308, 1311 (S.D. Fla. 1999), aff'd, 333 F.3d 1248 (11th Cir. 2003). Exxon thus owed to all dealers "[t]he duty to set the wholesale price in good faith, which incorporate[d] the duty not to charge its dealers twice for the cost of credit card processing." Id.

18

at 1314 n.7. "Because all of the dealer agreements were materially similar[,] . . . [w]hether [Exxon] breached [its] obligation[s] was a question common to the class and the issue of liability was appropriately determined on a class-wide basis." 333 F.3d at 1261.

We can discern no such similarity here, either as to the payment provisions, or as to other terms like the termination and waiver clauses that bear on Humana's potential liability. We begin with the payment clauses, which appear throughout the more than 300 contracts that fall within the ambit of the class definition. Humana argues, and we agree, that the differences in these provisions are reducible linguistically to a minimum of around 33 variants. In the district court, the plaintiffs attempted to organize these variants into six categories -- Groups A through F -- and their effort provides a useful starting point in assessing the similarity of the agreements' terms. After examining the contracts, however, we conclude that, notwithstanding the possibility of some further grouping, the diversity of the material terms is overwhelming.

The plaintiffs' Group A consists of contracts that require reimbursement for outpatient services at a percentage of billed charges, or at the particular hospital's "usual and customary charges less a [XX]% discount or the applicable inpatient per

diem, whichever is less."[7]  Group A represents a total of approximately 127

contracts whose payment clauses, at least, are materially similar in referring only to

some form of the hospitals' billed charges.[8]  So far, so good.

Group B is also numerous, with approximately 99 contracts, but is

considerably less uniform (and differs sharply in substance from Group A).  Each

contract in Group B provides for reimbursement based in some manner on hospital

charges or flat rates, but each contract also limits reimbursement as follows:

> Notwithstanding the above, Hospital agrees that in no event shall
> payments made for medical services provided to Beneficiaries exceed
> [XX] percent ([XX]%) of any CHAMPUS allowable . . . . "

See, e.g., Def. Ex. 144, at 10 (Attachment B).  Directly after this clause is a

parenthetical phrase beginning with "e.g.," and specifying two or more

reimbursement formulas.  Approximately 84 of the contracts read "(e.g., DRG,

CMAC, or billed charges)"; 3 read "(e.g., DRG, CMAC)"; 5 read "(e.g., DRG,

CMAC, or billed charges)," where "CMAC" is stricken through by hand; 1 reads

"(e.g., DRG, CMAC or outpatient charges)"; and 6 read "(e.g., DRG or billed

---

[7] The district court entered a protective order to prevent disclosure of, inter alia, the actual percentage rates in the network agreements, which Humana says are proprietary business information.  Because of that determination, and recognizing that the actual percentage rates are not relevant to this appeal, we adopt Humana's practice of replacing such numbers with "XX."

[8] In referring to the number of contracts here, we mean each contractual relationship between one of hospitals and Humana, even if in some cases the same agreement governs the relationships of multiple hospitals within a particular health system.

charges).”

Humana and the hospitals dispute the meaning of the “e.g.” clauses. The hospitals argue that while “[s]ome of the ‘notwithstanding clauses’ contain different examples of various CHAMPUS allowables within the parenthetical, . . . the phrase itself is the same for each,” and the payment clauses therefore are materially similar. Plaintiffs’ Statement of Facts, ¶ 47. At the Rule 23 hearing, the district court essentially agreed, observing that its “interpretation of the language, the plain language, [was] that[] [it is] an example of CHAMPUS allowable, and [that] . . . [f]or example, DRG or CMAC could be billed charges, could be ASC, whatever is provided for in the [Code of Federal Regulations].” 2 Hr’g Tr. 156. Humana argued that the “e.g. clauses” may affect the hospitals’ rights to receive a particular reimbursement formula.

We agree with Humana that the conclusion reached by the hospitals and the district court is not readily apparent -- at least not sufficiently so to homogenize the variant contracts for purposes of class certification. At a minimum, the conclusion is undermined by the parties’ decision, after “extensive discussions,” id. at 12, to strike the word “CMAC” from the “e.g. clause” in all five of the contracts for the Baptist Medical Center group in Jacksonville, Florida. If the allowables in parentheses were understood as mere examples, there would have been no legal or

practical purpose in striking them. The testimony of Phillip Boyce, who in 1999 was Senior Vice President of Managed Care at Baptist Jacksonville-St. Vincent Hospitals, and who was responsible for managing the TRICARE contracts, id. at 6, illustrates the point:

> Counsel: You eliminated the CMAC so that the limitation in what you might be reimbursed would not be capped at CMAC but would be the billed charges, and that Humana could not use CMAC to cap your charges for outpatient services; is that correct?
>
> Mr. Boyce: That's correct.

Id. at 75.

Whether or not striking of the word "CMAC" supports the hospitals' or Humana's position, the very act -- coupled with the substantial variety in the "e.g. clauses" themselves -- suggests that the clauses may not have the same legal meaning. Consistent with this suggestion, the Baptist-Jacksonville hospitals reacted to the change in payment methodology by stating: "Since we will be receiving 100% of CMAC for the lab and radiology, we are inclined to accept it and not open up the contract." Def. Ex. 164; 2 Hr'g Tr. 50.

Group C comprises approximately 65 hospital contracts with payment clauses that limit reimbursement to the "CHAMPUS allowable" or some portion thereof. Yet, whereas approximately 51 of these contracts merely provide for some discount off of the "CHAMPUS allowable," 13 -- those for the IASIS Healthcare

22

Corporation hospitals and the Tenet Health Systems hospitals -- also contain the familiar "notwithstanding clause" characteristic of Group B, with the notable declaration that "[t]he CHAMPUS allowable for hospital outpatient services is the HOSPITAL's billed charges," see, e.g., Def. Ex. 54, Amend. 2, ¶ D (emphasis added). The existence of this latter provision raises a peculiar possibility: namely, that even the "CHAMPUS allowable" was not necessarily understood before 1999 to be the hospitals' billed charges. Needless to say, this possibility creates a measure of tension among the various members of the plaintiffs' Group C.[9]

Group C also contains one contract -- that of Egleston Children's Hospital in Atlanta, Georgia -- which provides that "[o]utpatient rates are discounted off the current C[HAMPUS] allowable fees," and which sets forth a list of such discounts. Def. Ex. 84. Even ignoring the dubious relationship between the structure of this contract and that of the other members of Group C, it is facially unclear whether the phrase "C[HAMPUS] allowable fees" refers to the "CHAMPUS allowable," or to CHAMPUS Maximum Allowable Charges, i.e., CMAC rates. In short, Group C

---

[9] The special definitional clause is not the only evidence of a distinction in pre-1999 contracts between the CHAMPUS allowable and billed charges. For example, in a document titled "Interim Agreement" between Humana and Baptist Memorial Health Care Corporation of Mississippi, executed on May 13, 1996, the typed text reads: "For the Hospitals listed on Exhibit C, Hospital agrees to accept XX% of the CHAMPUS DRG allowable for the inpatient services and a XX% Discount from the Hospital charges for outpatient Hospital services." Ex. 109. A handwritten correction, however, initialed by the signatory parties, replaces the phrase "Discount from the Hospital charges" with "of the CHAMPUS allowable charges," indicating a perceived distinction between the two. Id.

also is not internally uniform.

Contract Groups D and E are unified principally by the presence in both of language that, as the plaintiffs concede, absolves Humana of liability. Group E, with 31 contracts, consists entirely of post-1999 agreements that expressly provide for reimbursement at CMAC rates. These contracts fall squarely within the class definition, but the hospitals concede that their language precludes a theory of breach based on Humana's payment of CMAC rates. See Answering Br. at 50 ("[T]he plaintiffs are not claiming a breach of contract for any subsequent contract where the parties have agreed specifically to be paid CMAC rates.").

Group D, for its part, contains 19 variously pre- or post-November 1999 contracts that refer to both CMAC and the "CHAMPUS allowable," and in some cases to billed charges. These contracts provide that laboratory and radiology services are to be reimbursed at either a percentage "of CMAC" or a percentage "of CMAC or 60% of Billed Charges," and that "[a]ll other outpatient" is to be reimbursed at a percentage of billed charges. In a variation on the Group B contracts, each of these provisions is accompanied by a "notwithstanding clause" and an "e.g. clause" listing various CHAMPUS allowables. We have difficulty seeing what glue holds Group D together at all.

Finally, we come to Group F, which the plaintiffs have appropriately labeled

24

"miscellaneous." As that label suggests, the provisions of these contracts have little in common with each other or with those of the preceding groups. We highlight only a few examples.

The network agreement of AMI Brookwood Hospital in Alabama (and apparently only that agreement) qualifies its specific payment formulas with the following phrase: "Notwithstanding the above, Hospital agrees to accept as payment in full, for all outpatient services and/or procedures not specifically listed above to Members, the Hospital's usual and customary charges less a [XX]% discount from the Standard C[HAMPUS] payment when provided to C[HAMPUS] participants." Def. Ex. 6 (emphasis added). The phrase "Standard CHAMPUS payment" is reminiscent of the phrase "CHAMPUS allowable fees," but bears an even more ambiguous relationship to the core vocabulary of this case, i.e., to the phrases "CHAMPUS allowable," CMAC rates, or any other commonly understood denomination.[10]

Two other contracts -- those of Dale Medical Center and Riverview Regional Medical Center in Alabama -- similarly provide for reimbursement of outpatient services, including "Emergency Room/CT/MRI/Outpatient," at "[XX]% of present [or "established"] C[HAMPUS] Rates." Def. Exs. 13 & 22. Different

_____

[10] The AMI Brookwood agreement was executed on June 29, 1998, and was in force at the time Humana began reimbursing at CMAC rates. Def. Ex. 6.

still -- and apparently no less ambiguous -- is the formula of the Woodland Community Hospital in Alabama, which went into effect on October 11, 1996, and which was in effect at the time of the switch to CMAC rates: it provides for reimbursement of outpatient services at a "[XX]% discount from the standard CHAMPUS allowable charges." Def. Ex. 28. It is quite unclear from the record in this case whether the quoted language refers to the "CHAMPUS allowable" or, with its conspicuous definite article, to "the . . . CHAMPUS [maximum] allowable charges," i.e., CMAC.

The language of some contracts provides greater guidance: one, for example -- that of the Houston Medical Center, Def. Ex. 86 -- provides for payment "at [XX]% of prevailing CHAMPUS maximum allowable rates (as defined in 10/1/93 Federal Register)." The cited section of the Federal Register, however, contains not a table of rates, but an array of provisions generally prescribing a method of calculating appropriate CMAC rates. See 58 Fed. Reg. 51227-01, 1993 WL 384025 (Oct. 1, 1993). And another contract within the same hospital group -- the agreement of Perry Hospital, effective at the time of the CMAC switch -- clouds this relative clarity. It contains essentially the same reference to the 1993 Federal Register entry, but provides further that

> [n]otwithstanding the above, Hospital [agrees] that in no event shall payments made for medical services provided to Beneficiaries exceed

[XX] percent ([XX]%) of any CHAMPUS allowable (e.g., DRG, [ASC], CMAC or billed charges).

Def. Ex. 86, at Attachment A. How these provisions interact is highly unclear.

On balance, we think the substantial variation found in the material terms of the many contracts makes this case a close relative of Broussard v. Meineke Discount Muffler Shops, 155 F.3d 331 (4th Cir. 1998), in which the Fourth Circuit vacated a $390 million jury verdict that was tainted by the district court's improper certification of numerous and disparate breach of contract claims. The plaintiffs in Broussard were franchisees who claimed that the franchisor, Meineke, had violated provisions in their franchise agreements governing the use of funds in an advertising account. In holding that variation in the agreements' material terms precluded a finding of commonality, id. at 340-44 -- much less a finding under the "far more demanding" predominance standard, Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997) -- the court stated unequivocally that "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts" where those contracts "contain[] materially different . . . language," Broussard, 155 F.3d at 340.

In illuminating the material differences in the franchise agreements, the Fourth Circuit explained that

[a]pproximately half of the contracts signed by class members . . . .

27

contain[] . . . language [that is] more favorable to Meineke[,] [whereas] . . . . about a quarter of the contracts, including some with the [more favorable language], contain language . . . [that] makes plaintiffs' case stronger . . . . [Y]et another variation among [the contracts] . . . rais[es] a wholly distinct set of interpretive issues.

Id. It was therefore "[e]vident[] . . . [that] the breach of contract action that [was] the cornerstone of plaintiffs' case raise[d] numerous uncommon questions." Id. Yet, the plaintiffs had been allowed to proceed to trial, and "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." Id. at 344.

Like the contracts in Broussard, the hospitals' agreements contain a variety of payment terms that variously bolster or detract from Humana's non-frivolous argument that CMAC rates are contractually valid. Also within this spectrum are terms that are not readily classifiable; these singular and enigmatic provisions further erode what marginal textual similarity exists here. They also open the door, under the law of the six relevant states, to consideration of extrinsic evidence[11] -- a topic that we take up below in the context of Humana's affirmative defenses.

While it acknowledged "some differences among the contracts' terms," the

---

[11] See, e.g., Higgins v. Tenn. Coal, Iron, & R.R. Co., 62 So. 774, 774 (Ala. 1913); Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544, 547 (Fla. Dist. Ct. App. 1973); Ga. Code Ann. § 24-6-3(b); Derbes v. GBS Props., LLC, 902 So. 2d 1109, 1112 (La. Ct. App. 2005); IP Timberlands Operating Co. v. Denmiss Corp., 726 So. 2d 96, 110 (Miss. 1998); Coble Sys., Inc. v. Gifford Co., 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981).

28

district court declined to address those differences and the potentially disparate contractual rights they create, holding that the contracts were "materially similar with respect to the determination of the liability issues raised by [the hospitals'] breach of contract claims." Certification Order, at 17. By its own explanation, the district court so held because Humana "allegedly applied the same lower fee schedules to all of its providers at the same time for the same reason." Certification Order, at 17. But by focusing solely on the defendant's course of conduct, the district court overlooked the substantial variation in the contracts and the corresponding rights and duties they provide the plaintiffs. Vega, 564 F.3d at 1272. Those rights and duties are in fact very disparate.

Finally, we cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. Certification Order, at 8 n.12, 18 n.22. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives way to nearly thirty subclasses.

29

Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation, § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996) ("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Broussard, 155 F.3d at 340. Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." Broussard, 155 F.3d at 344. The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. Id. at 340. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely

30

result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," Vega, 564 F.3d at 1279, of such unlawful results, and thereby abused its discretion.

2.

While the powerful variations in the contractual terms alone are fatal to the certified class, we also consider Humana's argument that extrinsic evidence relevant to the determination of liability is likely to overwhelm the common question. The problem of extrinsic evidence is best illustrated by reference to Humana's affirmative defenses to breach, which by definition will arise even if the question of breach is resolved in the hospitals' favor.

Even the most common of contractual questions -- those arising, for example, from the alleged breach of a form contract -- do not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements. The risk of voluminous and individualized extrinsic proof runs particularly high where a defendant raises substantial affirmative defenses to breach. In Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co. ("Elizabethtown"), 95 F.R.D. 168 (D. Del. 1982), for example, an independent bottler claimed that Coca-Cola had breached contractual provisions concerning the pricing of soft-drink syrup, and moved for

31

certification of a class of similarly situated companies. Even though the "contracts to be construed [were] <u>identical</u> in their material parts," the court refused to certify a class because "myriad . . . contract issues lurk[ed] in th[e] lawsuit, . . . [i]n particular, [the fact that] each unamended bottler's course of dealing with [Coca-Cola] would be relevant to construing the contract language, inasmuch as it could indicate knowledge of or acquiescence in [Coca-Cola's] pricing policies." <u>Id.</u> at 178 (emphasis added).

A related difficulty inheres in the application of multiple states' laws to the extrinsic evidence. <u>See, e.g.</u>, <u>Bowers v. Jefferson Pilot Financial Ins. Co.</u>, 219 F.R.D. 578, 583-84 (E.D. Mich. 2004) (holding that class certification was not appropriate in breach of contract action against insurer, where law of the state where insured was domiciled would govern, and there was significant variation in the laws of the relevant states with respect to the use of extrinsic evidence). Faced with this very problem, the court in <u>Elizabethtown</u> held that any common issues would be "submerged by the facts surrounding the course of dealing under each individual contract, and the application of different states' laws to each set of facts." 95 F.R.D. at 178.

In this case, Humana advances two principal affirmative defenses, each of which assumes for purposes of argument that the TMA did <u>not</u> mandate the use of

32

CMAC rates as the CHAMPUS allowable, and each of which is, at the very least, non-frivolous. In the first place, Humana argues that many hospitals ratified the use of CMAC rates either by renegotiating their contracts under the same terms after accepting CMAC payments, or by making statements indicating acceptance of an oral modification to their agreements. Thus, for example, named plaintiff Phoebe Putney Hospital amended its network agreement in July 2000, around seven months after Humana informed it of the switch to CMAC rates, but the amended agreement included precisely the same reimbursement language as its predecessor, under which Phoebe Putney alleges a breach. Def. Ex. 94.

St. Tammany Hospital of Louisiana also signed a revised agreement several months after the change in reimbursement policy, but despite the change, the agreement contained the same familiar cap on payments at a percentage "of any CHAMPUS allowable (e.g., DRG or CMAC)." Def. Ex. 105. And, on two subsequent occasions, Humana and St. Tammany modified their agreement to refer expressly to CMAC or TMAC, at least arguably suggesting that CMAC was understood ab initio as an acceptable payment method. Def. Ex. 105. On balance, it appears that as many as thirty other hospitals in the certified class similarly amended their agreements after the change in payment policy without altering the reimbursement language, and without protesting the CMAC payments.

33

Humana also cites its dealings with St. Vincent's and Baptist Jacksonville hospitals in support of a similar argument, namely, that some hospitals orally modified their agreements to provide for CMAC reimbursements. On September 7, 1999, the parties concluded an agreement, referenced above, that contained a "notwithstanding clause" in which the term "CMAC" was stricken through. When Humana announced the change to CMAC reimbursements in November 1999, however, the hospitals' negotiator told Humana that "[s]ince we will be receiving [a percentage] of CMAC for the lab and radiology [outpatient services], we are inclined to accept it and not open up the contract." Def. Ex. 164, at 2. Humana claims that, assuming the contract did not already incorporate CMAC, this statement is evidence that the parties' subsequent dealings did so.

Second, Humana contends that a majority of the hospitals -- apparently all but around nine of them -- waived their rights to assert a breach by accepting CMAC payments without protest, in many cases for many years. As noted, many of the hospitals also accepted the new payment formula despite having the right to terminate their network agreements upon 60 or 90 days' notice. See 1 Hr'g Tr. 152-53, 167; Def. Ex. 94 (contracts of named plaintiff Phoebe Putney Hospital); Def. Ex. 93 (contracts of Northside Hospital).

The district court minimized the impact of Humana's defenses on the

34

outcome of the predominance inquiry, stating that the defenses "largely involve individualized damages issues, not liability issues." Certification Order, at 17. We disagree. As an initial matter, we note that under the laws of each of the six relevant states, the defenses of ratification and waiver can operate to preclude liability itself.[12] More generally, we have recognized that where the defendant "proffer[s] individualized and varying evidence to defend against claims of individual class members by showing what they knew or should have known about" an allegedly illegal course of conduct of which they complain, "significant questions concerning ultimate liability [may] remain for many class members[,] . . . such . . . [that] the common questions [will] not predominate." Vega, 564 F.3d at 1274; see also Elizabethtown, 95 F.R.D. at 178 (explaining that the determination of whether class members acquiesced in defendant's allegedly illegal pricing scheme raised individualized questions of liability that defeated predominance).

In any event, we find no support in the text of Rule 23 or interpretive case

---

[12] Concerning the defense of ratification, see, for example, Meadow River Lumber Co. v. Univ. of Ga. Research Found., Inc., 503 S.E.2d 655, 661-62 (Ga. Ct. App. 1998); Frazier v. Harper, 600 So. 2d 59, 62 (La. 1992); Valley Fid. Bank & Trust Co. v. Cain P'ship, Ltd., 738 S.W.2d 638, 639-40 (Tenn. Ct. App. 1987); Dusenberry v. First Nat'l Bank of Birmingham, 122 So. 2d 716, 721-22 (Ala. 1959); Toffel v. Baugher, 111 So. 2d 290, 291 (Fla. Dist. Ct. App. 1959); and Wood Naval Stores Export Ass'n v. Latimer, 71 So. 2d 425, 430 (Miss. 1954). With respect to waiver, see, for example, Retail Developers of Ala., LLC v. E. Gadsden Golf Club, Inc., 985 So. 2d 924, 930 (Ala. 2007); Arbogast v. Bryan, 393 So. 2d 606, 608-09 (Fla. Dist. Ct. App. 1981); Ga. Farm Bureau Mut. Ins. Co. v. Bishop, 464 S.E.2d 9, 11 (Ga. Ct. App. 1995); Rogers v. Horseshoe Entm't, 766 So. 2d 595, 602 (La. Ct. App. 2000); Canizaro v. Mobile Commc'ns Corp. of Am., 655 So. 2d 25, 29 (Miss. 1995); and Gold Kist, Inc. v. Pillow, 582 S.W.2d 77, 79-80 (Tenn. Ct. App. 1979).

law for the district court's rigid distinction between liability and damages. While we have recognized that "the presence of individualized damages issues does not <u>prevent</u> a finding that the common issues . . . predominate," <u>Klay</u>, 382 F.3d at 1259 (emphasis added) (quoting <u>Allapattah</u>, 333 F.3d at 1261), it is never the plaintiff's burden to show that "<u>all</u> questions of fact or law [are] common, [only that] some questions are common and that they predominate over individual questions." <u>Id.</u> at 1254 (emphasis added).

Individualized damages issues are of course least likely to defeat predominance "where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." <u>Id.</u> at 1259-60. The relevant inquiry, however, is still whether questions of "liability to the class . . . predominate[] over . . . individual issues relating to damages," <u>Allapattah</u>, 333 F.3d at 1261 -- which is merely a more focused way of asking whether common issues predominate over individual ones. Plainly, the issues of ratification and waiver raised in this case cannot be "computed according to [a] formula, statistical analysis, or other . . . mechanical method[]." <u>Klay</u>, 382 F.3d at 1259-60. It was a clear error of judgment to brush them aside as mere "damages" issues.

The hospitals' final attempt to salvage the district court's predominance

finding also falls flat. They claim, on the merits, that because Humana's justification for the switch to CMAC payments was a sham, any ratification, acquiescence, or waiver cannot have been voluntary, knowing, or intelligent, and therefore must have been ineffective. In their answering brief on appeal, the hospitals translate this claim into an argument for class certification; specifically, they point out that the validity of their theory turns on whether Humana's justification was knowingly false, which of course requires answering the common question and presumably causes that question to predominate further. The hospitals' claim of a fraud or misrepresentation, however, raises yet more uncommon questions, as is best illustrated in the context of waiver.

The hospitals are correct that if waiver were obtained by fraud, it would negate any intentionality on their part, and therefore negate the waiver itself. But fraud is a peculiar species of falsity; it is the "intentional misrepresentation of a material fact made for the purpose of inducing another to rely, and on which the other <u>reasonably</u> relies to his or her detriment." <u>Charles v. Fla. Foreclosure Placement Ctr., LLC</u>, 988 So. 2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (emphasis added) (citing <u>Lopez-Infante v. Union Cent. Life Ins. Co.</u>, 809 So. 2d 13, 15 (Fla. Dist. Ct. App. 2002)); cf. <u>Ga. Farm Bureau Mut. Ins. Co. v. Bishop</u>, 464 S.E. 2d 9, 11 (Ga. Ct. App. 1995) (reversing finding of waiver as a matter of law with respect

37

to claim for recovery of unpaid wages, where there was "evidence that plaintiff did not know and could not reasonably have discovered the shortfall in his compensation"). In defending its waiver theory against the hospitals' theory of a misrepresentation, Humana would seek to discover not only whether the hospitals examined for themselves if the payment change was justified by federal policy, but, in case they did not, whether their blind reliance on Humana was reasonable.[13] Humana presumably would do so by recourse to individualized material such as email communications, meeting minutes, and the recollections of past and present officials -- as it already has with respect to several hospitals.

Beyond these formidable barriers to certification, there may be considerable variation in the state law under which any extrinsic evidence would have to be scrutinized. Although there is no categorical bar to class treatment where the law of multiple states will apply, courts have expressed some skepticism of such treatment, particularly in substantive areas where the content of state law tends to differ. See Elizabethtown, 95 F.R.D. at 177 (collecting cases for the proposition

---

[13] Some of the hospitals may not be able to claim at all that they were "tricked" into accepting CMAC. For example, Our Lady of the Lake representative Rene Ragas testified at the certification hearing that he had never heard of any "mandate[]" requiring Humana to reimburse the hospital based on CMAC rates at the relevant time. 1 Hr'g Tr. 199-200. Our Lady of the Lake began accepting CMAC rates without protest after the change in payment policy, id. at 131, 193, and absent such a representation by Humana, the hospital would be hard-pressed to argue that it was induced to do so on the basis of a misrepresentation. In any event, Humana would be entitled to probe the facts surrounding each network agreement to ascertain whether the inducement theory holds water.

38

that "[c]ourts have often refused to certify class actions when they involve the law of more than one state"). Undeniably, it falls to the plaintiff to demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable. Klay, 382 F.3d at 1262.

Notably, in cases implicating the law of all fifty states, "[t]he party seeking certification . . . must . . . provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." Cole v. Gen. Motors Corp., 484 F.3d 717, 724 (5th Cir. 2007) (emphasis added) (quotation marks and citations omitted); see also Klay, 382 F.3d at 1262. Without deciding what level of analysis is appropriate in a case such as this one where the laws of fewer than all fifty states are at issue, it is clear that more than a perfunctory analysis is required. "The issue can only be resolved by first specifically identifying the applicable state law variations and then determining whether such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (citation omitted). It is "the court's duty to determine whether the plaintiffs have borne their burden where a class will involve multiple jurisdictions and variations in state law." Spence v. Glock, Ges.m.b.H., 227 F.3d 308, 313 (5th Cir. 2000).

The district court acknowledged that there might be "some variations in state law," but, because the law of "only six states would be involved," it thought the common issues "should not be overwhelmed by distinctions in individual state law." Certification Order, at 18. The district court further thought that if distinctions began to overwhelm the common issues, the use of six subclasses corresponding to the six applicable bodies of state law would be an expedient solution. As with the variations in contractual language, however, we can find no serious analysis of the variations in applicable state law relative to Humana's affirmative defenses. See Spence, 227 F.3d at 313. That procedural error "ha[s] resulted in a critical legal deficiency -- insufficient evidence of predominant common legal issues," id., and is further evidence of an abuse of discretion.

Moreover, a brief survey of the relevant states' laws reveals the importance of a "rigorous analysis" of each aspect of class certification, including the question of whether variations in state law will destroy predominance. We again refer to the law of waiver to illustrate the point. All six of the relevant states define waiver as the voluntary or intentional relinquishment of a known right.[14] This uniformity, however, unravels beyond the definition. Of particular relevance to Humana's

_____

[14] See, e.g., Mullis v. Bibb County, 669 S.E.2d 716, 720 (Ga. Ct. App. 2008); Channel v. Loyacono, 954 So. 2d 415, 425 (Miss. 2007); Bell v. Birmingham Broad. Co., 82 So. 2d 345, 347 (Ala. 1955); Arbogast v. Bryan, 393 So. 2d 606, 607-08 (Fla. Dist. Ct. App. 1981); Gold Kist, Inc. v. Pillow, 582 S.W.2d 77, 79 (Tenn. Ct. App. 1979); Breaux v. Laird, 88 So. 2d 33, 38 (La. 1956).

waiver defense is the extent to which conduct alone may be deemed a waiver of known rights. Among the six relevant states, there are varying degrees of solicitude or hostility towards this method of proof.

Under Florida law, "[i]t is axiomatic that . . . . [a] party may waive any rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished." Hammond v. DSY Developers, LLC, 951 So. 2d 985, 988 (Fla. Dist. Ct. App. 2007) (quotation marks and citations omitted); see also Torres v. K-Site 500 Assocs., 632 So. 2d 110, 112 (Fla. Dist. Ct. App. 1994) (seller waived notice provision in contract by failing to promptly invoke it, and by allowing buyers to proceed with performance under contract). "Although waiver does not arise from forbearance for a reasonable time, it may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived." Arbogast v. Bryan, 393 So. 2d 606, 608 (Fla. Dist. Ct. App. 1981) (party's failure to timely speak out and enforce a claim to commissions due from a transaction constituted waiver). In other words, "[w]here a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." Acosta v. Dist. Bd. of Trs. of Miami-Dade Cmty. Coll., 905 So. 2d 226, 229 (Fla. Dist. Ct.

41

App. 2005) (citation omitted) (holding that medical students claiming breach of contract by university for tuition increases acquiesced, "through their conduct . . . [of] commencing the program, satisfying all their course requirements, and eventually graduating, . . . [in paying] the higher tuition").

By contrast, Louisiana heartily discourages its courts from finding waiver. While its quantum of proof is not uncommon -- conduct indicating waiver must be "so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished," Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So. 2d 1371, 1374 (La. 1987) -- the Louisiana courts recognize that "[t]he doctrine of waiver or estoppel contravenes the legal rights of the person sought to be estopped," Breaux v. Laird, 88 So. 2d 33, 38 (La. 1956), and therefore "should be applied only in exceptional cases where its application is necessary to effectuate justice or prevent injustice." Aetna Fin. Co. v. Antoine, 343 So. 2d 1195, 1198 (La. Ct. App. 1977) (quoting Breaux, 88 So. 2d at 38); Pittman Constr. Co. v. Housing Auth. of New Orleans, 179 So. 2d 900, 905 (La. 1965) (citation omitted). Indeed, the Louisiana courts could hardly be more explicit in pronouncing that "[w]aiver . . . is not favored in Louisiana law[,] . . . such [that] claims [of waiver] must be examined carefully and strictly," Alexander v. Cornett, 961 So. 2d 622, 632 (La. Ct. App. 2007) (emphasis added); see also Howard Trucking Co., Inc. v.

42

Stassi, 485 So. 2d 915, 918 (La. 1986) ("'Estoppel' in its various forms seems to be a doctrine of last resort. In Louisiana, no statutory material and no body of jurisprudence justifies its use. In this court we have discussed it, in modern times, only to disallow a claim that the opponent ought not to be able to make a certain claim or defense.").[15]

To complicate matters still further, the common law rule of waiver can be modified by contract, and it appears to have been in many of the contracts at issue here. Specifically, many of the class members' contracts contain the following provision relating to waiver:

> Waiver, whether express of implied, of any breach of any provision of this Agreement shall not be deemed to be a Waiver of any other provision or a waiver of any subsequent breach of the same provision.

See, e.g., Ex. 9 (Baptist Health Contract). Assuming, as one reasonably might, that each instance of reimbursement for a service at CMAC rates constituted a separate alleged breach of a particular hospital's contractual right to be reimbursed at a different rate, the quoted provision could be read to foreclose a waiver argument altogether. But state law appears to vary with respect to whether this non-waiver

---

[15] Because the record discloses no serious analysis of the applicable state law and its potential variations, we need not undertake an exhaustive survey -- or indeed any survey at all -- of the relevant law to determine whether its content is sufficiently uniform. We provide a brief discussion, however, to underscore the importance of this type of analysis whenever a putative class action implicates the law of multiple jurisdictions.

provision would be enforceable.

Under Georgia law, it is well-established that even "a provision against waiver of contractual rights may itself be waived." J.W. Truck Sales, Inc. v. Hartrampf Outdoor, L.L.L.P., 631 S.E.2d 750, 752 (Ga. Ct. App. 2006) (quoting J.E.M. Enters. v. Taco Pronto, Inc., 244 S.E.2d 253, 255 (Ga. Ct. App. 1978)). See also Smith v. Gen. Fin. Corp. of Ga., 255 S.E.2d 14, 15 (Ga. 1979) ("[E]vidence of the buyer's repeated, late, irregular payments, which are accepted by the seller. . . raise[s] [a jury question] as to whether the anti-waiver provision in the loan contract was itself waived."); Fulton v. Anchor Sav. Bank, FSB, 452 S.E.2d 208, 216 (Ga. Ct. App. 1994) (holding that doctrine of waiver was available to plaintiff-debtor against defendant-creditor bank in an action for wrongful repossession of automobile, despite provision in the loan contract allowing lender to "waive or delay enforcing any of [its] rights without losing them," since, although plaintiff had violated provision requiring notice before moving loan collateral from address of record, there was evidence she had informed bank of new address, and that bank had sent notices to new address under agreement); see also Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc., 329 S.E.2d 554, 558-59 (Ga. Ct. App. 1985) (reversing summary judgment for defendant relying on particular contractual provision where fact questions remained as to whether

defendant's conduct amounted to waiver of subject provision, and whether anti-waiver provision providing that no part of the agreement "may . . . be modified, waived, or changed except in writing signed by both parties hereto" itself had been waived).

By contrast, "Florida courts have consistently enforced [anti-waiver] clauses," Nat'l Home Communities, L.L.C. v. Friends of Sunshine Key, Inc., 874 So. 2d 631, 634 (Fla. Dist. Ct. App. 2004), including of the kind found in many of the hospitals' network agreements, id. (interpreting anti-waiver provision stating that "[n]o waiver by either party of any provision of this Agreement shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision"). In Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 519 (Fla. Dist. Ct. App. 1991), for example, the court strictly enforced an anti-waiver clause providing that "no waiver of any rights or obligations hereunder shall be deemed to have occurred unless in writing signed by the party against whom such waiver is asserted and no waiver shall be deemed a waiver of any other or subsequent right or obligation"; the court held that the "buyer's affirmative defenses of waiver and estoppel were defeated as a matter of law by the provisions of the contract itself." Id. at 522. See also Eskridge v. Macklevy, Inc., 468 So. 2d 337, 339 (Fla. Dist. Ct. App. 1985) (holding that lessor who continued to accept benefits under lease could

terminate option clause where lease contained anti-waiver provision); <u>Philpot v.</u>

<u>Bouchelle</u>, 411 So. 2d 1341, 1344-45 (Fla. Dist. Ct. App. 1982) (holding that anti-

waiver clause precluded waiver defense, and explaining that while acceptance of

benefits ordinarily can constitute a waiver of the right to assert a breach, "the

parties contractually modified the common law rules of waiver" by including an

anti-waiver provision).

We also cannot say that the district court's proposed use of subclasses

corresponding to the six bodies of applicable state law would be an adequate

response to the apparent differences in those laws. We again recognize the practice

of creating subclasses in class actions, but we again find impediments to their

beneficial use in this case. Principally, while the proposed state-law subclasses

might suffice if the underlying contracts were uniform, the material provisions of

the contracts are anything but uniform. For that reason, a necessary (but not

sufficient) step towards managing the variety would be to create subclasses

corresponding to different variants of the payment clauses. That division,

however, does not remotely correspond to the division of states' laws as they apply

to the interpretation of the material contract terms, or to evidence of subsequent

conduct modifying the rights flowing from those terms. The point is evident even

if we consider only those contracts in force at the time of the payment switch. The

46

putative Alabama subclass, as just one example, would comprise 19 contracts in Group A, 9 in Group B, 10 in Group C, 1 in Group D, and 8 in Group F.[16] In other words, when the two sets of six subclasses are overlaid upon one another, "the proliferation of disparate factual and legal issues is compounded exponentially." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996).

3.

In sum, beyond the difficulty of managing the variation among the payment provisions and other material terms, the trial court would be required to evaluate significant quantities of individualized extrinsic evidence associated with Humana's affirmative defenses, and the hospitals' response to those defenses would implicate even more such individualized evidence. Furthermore, the evaluation of all of this evidence would appear to be complicated by substantial variations among the six bodies of state law that apply. Under these circumstances, we have little difficulty concluding that the district court's certification of this class was an abuse of discretion.

---

[16] Because our example considers only those contracts in force at the time of the payment change, it excludes all of Group E, which comprises only post-November 1999 contracts that create no liability for Humana. For the sake of completeness, we note that the Florida subclass would comprise 34 contracts in Group A, 20 in Group B, 14 in Group C, and 5 in Group F. The Georgia subclass would comprise 13 contracts in Group A, 9 in Group B, 21 in Group C, and 3 in Group F. The Louisiana subclass would comprise 4 contracts in Group A, 10 in Group B, and 2 in Group C. The Mississippi subclass would comprise 5 contracts in Group A, 9 in Group B, 2 in Group C, and 2 in Group F. And, the Tennessee subclass would comprise 20 contracts in Group A, 35 in Group B, 13 in Group C, and 1 in Group D.

B.

The second prong of Rule 23(b)(3) requires a court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The focus of this analysis is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay, 382 F.3d at 1269. As a result, the predominance analysis has a "tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims," id., both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability, see Fed. R. Civ. P. 23(b)(3)(D). The converse is also true: the less common the issues, the less desirable a class action will be as a vehicle for resolving them. In particular, "[t]he creation of a number of subclasses . . . in a Rule 23(b)(3) suit . . . may defeat the superiority requirement" by splintering the proposed class and thereby diminishing the relative value of a class action over other forms of litigation. See Manual for Complex Litigation, § 21.23 (4th ed. 2004). And of course, a class action containing numerous uncommon issues may quickly become unmanageable.

We have little to add on the subject of superiority in this case. Principally,

the lack of predominance belies any suggestion that a _fair_ administration of the class claims could "save[] the resources of both the court[] and the parties." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982) (citation omitted). Furthermore, given the lack of uniformity within several of the proposed contract subclasses, the existence of more than 20 contracts that do not belong to any meaningful category, and the likely need for at least some subdivision according to applicable state law, there may be little value left in a class action once the proposed class is adequately partitioned, which in turn may make class action alternatives such as joinder particularly appropriate. Finally, it need hardly be said that class treatment in this case runs the risk of being severely unmanageable.

We make only one additional observation. The Supreme Court has reminded us that

> [w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all. . . . The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) (citations and quotation marks omitted). While we are not blind to the disparity in power

between Humana and even the largest of the class members here, the class members are neither powerless to act nor ignorant of their legal rights. To the contrary, they have a substantial stake in the dispute and assuredly do not lack the means of obtaining representation. Even in a borderline case, that fact might well counsel against class treatment. In this case, however, the fact is that a series of disparate questions overwhelms what may be common, such that use of the class action methodology would be "either singularly inefficient . . . or unjust," Klay, 382 F.3d at 1269 (citation omitted) (amendment in original), as a vehicle for litigating the claims of 260 putative hospital plaintiffs in this contract action.

III.

We reverse the district court's order certifying this action for class treatment and remand for further proceedings consistent with this opinion. We leave it to the district court and the parties to determine whether any subset of the claims or class members might be susceptible of fair and efficient class treatment in accordance with the principles we have set forth at some length.

**REVERSED AND REMANDED**.